# IN THE COURT OF APPEALS OF IOWA

No. 13-1878
Filed October 15, 2014

**IN RE THE MARRIAGE OF JAIME MCMANUS
AND THOMAS RONALD MCMANUS**

**Upon the Petition of
JAIME MCMANUS,**
      Petitioner-Appellee,

**And Concerning
THOMAS RONALD MCMANUS,**
      Respondent-Appellant.

_____

Appeal from the Iowa District Court for Clinton County, Mark J. Smith, Judge.

A husband appeals from a decree of dissolution of his marriage.

**AFFIRMED AS MODIFIED.**

R. Douglas Wells of Gomez May, L.L.P., Davenport, for appellant.

Patricia Zamora of Zamora, Tylor, Woods & Frederick, Davenport, for appellee.

Considered by Potterfield, P.J., and Tabor and Mullins, JJ.

**MULLINS, J.**

Thomas McManus appeals from a decree dissolving his marriage to Jaime McManus. Thomas argues the district court erred by awarding Jaime physical care of the minor children, awarding Jaime part of Thomas's retirement account, failing to award Thomas an extraordinary visitation credit in calculating his child support obligation, and failing to order Jaime to pay uninsured medical expenses. We find the district court failed to apply Iowa Court rule 9.9 (2013) correctly to give Thomas an extraordinary visitation credit, and failed to apply rule 9.12(5) correctly to require Jaime to pay some uninsured medical expenses. We affirm the decree as modified.

## I.    BACKGROUND FACTS AND PROCEEDINGS.

Thomas, born 1971, and Jaime, born 1981, were married in 2003. They have two children, born 2004 and 2007. Thomas is employed as a deputy city assessor making approximately $61,000 per year. Jaime is employed as an intermediate school teacher making approximately $48,000 per year.

Jaime filed for dissolution of the marriage in June 2012. Following trial, the district court filed a decree of dissolution in September 2013. In the decree the court ordered joint legal custody of the children with Jaime having physical care. Thomas has visitation every other weekend, from 5:15 p.m. on Friday to 7:00 a.m. on Monday; every Tuesday from 5:15 p.m. to Wednesday 7:00 a.m.; alternate holidays;[1] and two uninterrupted weeks of summer vacation. The court

---

[1] Holiday visitation is 9:00 a.m. to 8:00 p.m. on New Year's Day, Easter, Memorial Day, Independence Day, Labor Day, and Thanksgiving (which is to be a four-day holiday.) The court also ordered the parties to alternate the Christmas holiday from when the

ordered Thomas to pay $963 per month in child support. The court also ordered the parties to divide the cost of the children's uninsured medical expenses according to their income: fifty-six percent to be paid by Thomas and forty-four percent to be paid by Jaime. The court next divided the marital property, awarding Thomas the marital home and splitting the parties' retirement savings by awarding Jaime part of Thomas's Iowa Public Employee Retirement Savings (IPERS) account. Thomas appeals.

## II.   STANDARD OF REVIEW.

We review dissolution proceedings de novo. Iowa R. App. P. 6.907. We give weight to the factual findings of the district court, especially concerning the credibility of witnesses, but are not bound by them. Iowa R. App. P. 6.904(3)(g).

## III.   ANALYSIS.

### A.   Custody Arrangement.

In matters of child custody, the first and governing consideration of the court is the best interest of the child. Iowa R. App. P. 6.904(3)(o). Prior cases have little precedential value, except to provide a framework for analysis; we must base our decision on the facts and circumstances before us. *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992). The Iowa Code provides a nonexclusive list of factors the court shall consider in determining a custodial arrangement. Iowa Code § 598.41(3) (2011).[2] In addition to the statutory

---

children are released from school until Christmas Eve at 8:00 p.m. and Christmas Day until New Year's Eve at 8:00 p.m.
[2] These factors are:
     a. Whether each parent would be a suitable custodian for the child.

factors, the court also must consider the factors identified in *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974),[3] in determining the award of

---

b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

c. Whether the parents can communicate with each other regarding the child's needs.

d. Whether both parents have actively cared for the child before and since the separation.

e. Whether each parent can support the other parent's relationship with the child.

f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.

g. Whether one or both the parents agree or are opposed to joint custody.

h. The geographic proximity of the parents.

i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

j. Whether a history of domestic abuse, as defined in section 236.2, exists. In determining whether a history of domestic abuse exists, the court's consideration shall include but is not limited to commencement of an action pursuant to section 236.3, the issuance of a protective order against the parent or the issuance of a court order or consent agreement pursuant to section 236.5, the issuance of an emergency order pursuant to section 236.6, the holding of a parent in contempt pursuant to section 664A.7, the response of a peace officer to the scene of alleged domestic abuse or the arrest of a parent following response to a report of alleged domestic abuse, or a conviction for domestic abuse assault pursuant to section 708.2A.

k. Whether a parent has allowed a person custody or control of, or unsupervised access to a child after knowing the person is required to register or is on the sex offender registry as a sex offender under chapter 692A.

[3] These factors are:

1. The characteristics of each child, including age, maturity, mental and physical health.

2. The emotional, social, moral, material, and educational needs of the child.

3. The characteristics of each parent, including age, character, stability, mental and physical health.

4. The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.

5. The interpersonal relationship between the child and each parent.

6. The interpersonal relationship between the child and its siblings.

physical care. *See Will*, 489 N.W.2d at 398. "The ultimate objective of a physical care determination is to place the child in the environment most likely to bring him to healthy mental, physical, and social maturity." *McKee v. Dicus*, 785 N.W.2d 733, 737 (Iowa Ct. App. 2010). The question of physical care must be determined based on what is in the best interest of the child, not on what is fair to the parents. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Stability and continuity in caregiving are primary factors in determining an award of physical care. *Id.* at 969. Past caretaking patterns, including primary caregiving, weigh heavily in custody matters. *Id.*; *In re Marriage of Decker*, 666 N.W.2d 175, 178-80 (Iowa Ct. App. 2003).

The district court gave the parties joint legal custody and gave Jaime physical care. Thomas contends the district court should have ordered the parties to have joint physical care. The district court found Jaime has been the primary caregiver throughout the children's lives. It expressed concern about Thomas's consumption of alcohol and his conduct while intoxicated. The court also was concerned about Jaime allowing her paramour to be present around her children.

---

7. The effect on the child of continuing or disrupting an existing custodial status.
8. The nature of each proposed environment, including its stability and wholesomeness.
9. The preference of the child, if the child is of sufficient age and maturity.
10. The report and recommendation of the attorney for the child or other independent investigator.
11. Available alternatives.
12. Any other relevant matter the evidence in a particular case may disclose.
*Winter*, 223 N.W.2d at 166-67.

Both parties testified that Jaime has been the primary caregiver for the children throughout their lives. Thomas claimed his involvement included, "everything since birth." However, when pressed for details, he enumerated birthday parties, chaperoning field trips, and taking the children to their first day of school. He admitted he rarely helped cook or feed them. He also admitted that Jaime ran the household for the nine years of their marriage, including doing the cooking, cleaning, laundry, and caring for the children. Jaime and Thomas both testified Thomas had become more involved with the children since she filed for dissolution. The couple's younger child has a severe peanut allergy. However, while Jaime testified she carries an emergency allergic reaction "pen" with her at all times, Thomas testified he does not.

Jaime detailed the children's daily routine, which aligns with her schedule as a schoolteacher. If Thomas has visitation the night before, he drops the children off at her home in the morning, and she gets them ready for school including dressing them, giving them breakfast, and packing their lunches. This is particularly important for the child with the peanut allergy. She takes them to her workplace at the intermediate school, where they board their bus for the elementary school. After school, they take the same bus back to the intermediate school, meet Jaime, and go home with her. If Thomas has visitation that evening, he picks them up from Jaime's home.

Jaime and Thomas also testified about Thomas's drinking habits. Jaime stated Thomas is a binge drinker. She claims Thomas's involvement with the children has been limited due to his social engagements that often involve heavy

drinking. In particular, she noted that during their marriage, after his Wednesday pool league nights, Thomas would come home very late or not at all. He also would occasionally miss the next day of work, claiming he was ill or that one of the children was ill. This became such a problem that Thomas's boss gave him a list of all the days Thomas had missed work and asked him to explain whether they truly were due to illness or something else.

Jaime described Thomas's personality as volatile, explosive, and controlling and suggested alcohol exacerbated these attributes. She described numerous incidents involving Thomas's heavy drinking. On one occasion, Thomas had been drinking all day with friends when Jaime picked him up to drive home. The children were in the car. Thomas became angry, grabbed the steering wheel from Jaime, and caused the car to swerve off the road. He then punched and damaged the windshield and dashboard. Jaime also testified that on one occasion, Thomas got drunk, crashed his car, and hid from the police all night in a cornfield. Thomas testified this was in 2001 and not related to alcohol. In 2008, Thomas and his brother were in a bar and pushed the bartender through a window. Thomas pled guilty to assault causing injury, and was ordered to pay approximately $3600 in restitution. He also was ordered to participate in anger management classes. In 2009, during the state high school baseball tournament, Thomas and a group of men were intoxicated in a downtown Des Moines hotel and attempted to push a piano up an escalator, destroying the piano and damaging the escalator. Thomas was charged with public intoxication and ordered to pay $8300 in restitution. Thomas contends most of these

incidents occurred before the marriage and before the children were born. He insists he is not an alcoholic, only a social drinker.

Jaime also testified about her new paramour. She stated they had been dating around eight months. She had introduced the paramour to her children five months prior. The paramour had spent the night at Jaime's home, while the children were present, two or three times. She and the children had spent the night at the paramour's home four or five times. When asked whether she thought it was appropriate for the children to be introduced to her paramour, Jaime said, "I've been trying to get divorced for a year and a half, so I think it's time we move on, yes."

Thomas contends the district court put too much weight on his alcohol issues because he had never harmed the children in any way. He argues the court should have awarded him joint physical care with Jaime, which would require adding only one night per week to the existing schedule. He also requests that the drop-off time be changed from 7:00 a.m. to 8:00-8:15 a.m. and that he be allowed to drop the children off at school himself.

Thomas has made dubious personal choices regarding his consumption of alcohol and his conduct while intoxicated. Thomas insists most of the incidents involving alcohol took place prior to his marriage or the birth of the children. Yet, the incident with the bartender and the incident in the hotel—both resulting in criminal charges—occurred after the children were born. It is also clear from the testimony that Thomas's consumption of alcohol continued to affect their family life well after the children were born. The district court found Jaime's testimony

regarding various incidents involving Thomas's drinking was credible. It further found Thomas's alcohol abuse was an issue in his life that would adversely affect the children. The court was so concerned it ordered him not to consume alcohol six hours prior to or during his visitation. We too are concerned about the choices Thomas has made and how they have affected his family.

The testimony also makes clear Thomas was rarely involved in the children's care prior to the dissolution action. Jaime has been the children's primary caregiver throughout their lives. She and the children have established a routine for school days. Her work schedule fits directly with the children's school schedule. In view of all the factors relevant to this determination, and giving deference to the district court's credibility determinations, we find it is in the children's best interest for Jaime to remain their primary caregiver. This is the environment most likely to bring the children to healthy mental, physical, and social maturity. Thus, we affirm the district court order to maintain the care arrangement currently in place where Jaime has physical care and Thomas has liberal visitation.

## B. Property Division.

We examine the entire record and adjudicate anew the issue of property distribution. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). We will disturb the district court's ruling only when there has been a failure to do equity. *Id.* Marital property is divided equitably, considering the factors in Iowa Code section 598.21(5). *Id.* at 678.[4] "An equitable distribution of marital

---

[4] These factors include:

property, based upon the factors in 598.21(5), does not require an equal division of assets." *Id.* at 682 (quoting *In re Marriage of Kimbro*, 826 N.W.2d 696, 703 (Iowa 2013)). "Equality is, however, often most equitable," and Iowa courts generally insist upon equal or nearly equal division of marital assets. *Id.* "To achieve an equitable division, we apply the factors contained in section 598.21(5), keeping in mind there are no hard and fast rules governing economic issues in dissolution actions." *Id.* Our decision depends on the particular facts relevant to each case. *Id.*

---

a. The length of the marriage.

b. The property brought to the marriage by each party.

c. The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.

d. The age and physical and emotional health of the parties.

e. The contribution by one party to the education, training, or increased earning power of the other.

f. The earning capacity of each party including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children, and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonable comparable to that enjoyed during the marriage.

g. The desirability of awarding the family home or the right to live in the family home for a reasonable period to the party having custody of the children, or if the parties have joint legal custody, to the party having physical care of the children.

h. The amount and duration of an order granting support payments to either party pursuant to section 598.21A and whether the property division should be in lieu of such payments.

i. Other economic circumstances of each party, including pension benefits, vested or unvested.

j. The tax consequences to each party.

k. Any written agreement made the parties concerning property distribution.

*l.* The provisions of an antenuptial agreement.

m. Other factors the court may determine to be relevant in an individual case.

The district court awarded Thomas the marital home along with the debt on it and divided the remaining assets, awarding Jaime a portion of Thomas's IPERS account through a Qualified Domestic Relations Order. Thomas filed a motion to amend and enlarge, contending the parties stipulated that each would retain its own IPERS account. The district court declined to alter its property division stating:

> In reviewing the Stipulation of Assets and Liabilities, it is indicated that the parties' IPERS accounts shall be received by the parties. However, there is nothing in this joint statement, nor was there anything indicated at the time of trial, that the Court was not to make an equitable distribution of those assets if they do not equalize. The Court declines to change its award of the retirement benefits unless the parties agree that this was an oversight and agree that the parties stipulated that each would keep their own retirement accounts without the Court equalizing their values.

Thomas contends the parties did stipulate that he would receive the marital home and all its debt, and they would each keep their own retirement assets. Jaime insists there was no stipulation, and the retirement accounts are listed as disputed in the parties' joint statement of assets and liabilities.[5] Nonetheless, the court retains the power to reject the contents of a stipulation if they are unfair or contrary to law. *In re Marriage of Briddle*, 756 N.W.2d 35, 40 (Iowa 2008). Further, we note the joint statement was more akin to a stipulation as to certain evidence and the claims each party expected to assert than to a stipulation settling the issues to be resolved by the court. Here, the district court was

---

[5] We note that the parties submitted in their appendix a copy of the Joint Statement of Assets and Liabilities that is not file stamped and does not match the original in the court file. We consider the original filing from the court file, not the appendix copy.

required by law to distribute the marital assets equitably. Thus, we review the court's property division for failure to do equity.

The parties submitted a joint statement of assets and liabilities containing their estimates of the value of the marital home. Both parties agreed the mortgage on the house was $155,000. Thomas estimated the house was worth $130,000. He testified the house was upside down by about $20,000. Jaime estimated the house was worth $159,000 and agreed it was upside down by about $20,000. She testified the house was appraised at $160,000 and indeed, when Thomas attempted to sell the home, he listed it at $155,000. The district court found it was "unable to ascertain the value of the residence, due to the lack of proof thereon." Accordingly, it found that the mortgage was equal to the value of the home, i.e. $155,000. The district court ordered that Thomas retain the home and assume the mortgage. In its calculations, therefore, the value of the asset it awarded to Thomas was offset by the amount of debt attached the asset.[6]

The court further divided the parties' property as follows: Jaime was awarded the First Trust & Savings checking account ($100), half of the children's savings accounts, her IPERS pension ($18,000), the children's playhouse ($1800), a television ($2200), and part of Thomas's IPERS account pursuant to a Qualified Domestic Relations Order in the amount of $25,575. The court ordered

---

[6] The same was true of the swimming pool installed in the back yard of the marital home—although the court awarded the swimming pool to Thomas, the debt on the installation of the swimming pool ($2200), neutralized its value as an asset. The same was also true of the parties' two cars—each one was encumbered with enough debt to neutralize it as an asset in the calculation of the property division.

her to pay the debts on the Capital One credit card ($8500) and the Discover Card ($2600.) Thus, Jaime received net $36,575 in the property division.

Thomas was awarded the First Central State Bank checking account ($40), half of the children's savings accounts, his IPERS account in the amount of $14,425 ($40,000 – $25,575), his 457B retirement account in the amount of $24,000, the savings bonds ($200), four tractors ($2500), and the golf cart ($500).[7] Thus, Thomas received net $41,665. If Thomas had retained his full IPERS account, he would have received $67,240, and Jaime would have received $11,000, clearly an inequitable result. Thus, the court's equalization of the retirement assets was consistent with law and equity. Accordingly, we affirm the district court's distribution of the marital property, including the transfer of $25,575 of Thomas's IPERS to Jaime.

### C.    Extraordinary Visitation Credit.

Courts are required to apply the Iowa Child Support Guidelines set out in Chapter 9 of the Iowa Court Rules. Rule 9.11 proscribes variance from the guidelines unless the court makes "a written finding that the guidelines would be unjust or inappropriate." Rule 9.9 provides, "If the noncustodial parent's court-ordered visitation exceeds 127 days per year, the noncustodial parent shall receive a credit to the noncustodial parent's share of the basic support

---

[7] There were a number of debts the court did not consider as marital debts. The court did not consider the debt on Thomas's Capital One card marital debt because it primarily reflected the debt from the restitution he was ordered to pay for damaging the piano and escalator. The court did not consider Jaime's student loans as marital debt, there being insufficient evidence to determine whether it was acquired during the marriage.

obligation." The rule adds, "For the purposes of this credit, 'days' means overnights spent caring for the child(ren)."

When the district court in its original decree failed to apply this credit, Thomas filed a motion to amend and enlarge. The court explained its failure to apply the credit in the following manner:

> Thomas [has] the children on alternate weekends from 5:15 p.m. on Friday until 7:00 a.m. on Monday. This is a total of 2.5 days for 26 weekends [2.5 x 26 = 65 days]. The Court also ordered [Thomas] to have visitation from Tuesday at 5:15 p.m. until Wednesday at 7:00 a.m. [0.5 x 52 = 26.] The court considered this one-half day, with both weekday and weekend visitation totaling 91 days [65 + 26 = 91]. The Court further ordered three holidays per year, with Thanksgiving being a four-day holiday [at most 7 days]. In addition to the above, each party was awarded two uninterrupted weeks per year for summer vacation for a total of 14 days. [91 +7 + 14 = 112.] In addition to the above, the Court ordered every Mother's Day to be with Jaime and every Father's Day with Thomas. The above-stated schedule does not exceed the 127 days required for extraordinary visitation credit. Under the Child Support Guidelines Rule 9.4, the Court may adjust child support upward or downward, and Rule 9.9 under the Child Support Guidelines allows the Court discretion concerning the definition of "days," which can mean overnights spent caring for the child, but does not require the Court to give 24 hours credit just because the children spent an overnight with the noncustodial parent.

Thomas contends that by his calculation he has 142 overnight visits per year, and the court should have given him an extraordinary visitation credit or made written findings justifying its departure from the child support guidelines. Rule 9.9 provides that if "court-ordered visitation exceeds 127 days per year, the noncustodial parent shall receive a credit." Rule 9.9 defines "days" as "overnights spent caring for the child(ren)."[8] Notwithstanding the district court's

---

[8] The court does have a limited discretion to modify the percentage credit due to "[f]ailure to exercise court-ordered visitation." *See* Iowa Ct. R. 9.9.

logical explanation, the express terms of the rule do not provide for discretion in defining "days." Thus, Thomas has, on every other weekend, Friday, Saturday, and Sunday night (3 days x 26 weeks = 78); every week Tuesday night (52 days – 3 days during the weeks of Christmas and summer break = 49); two weeks in the summer (9 additional days (14 days – 1 weekend and 2 Tuesdays)); three holidays not including Thanksgiving (no overnights, thus 0 days); alternate four-day holiday Thanksgivings (3 days, or on average 1.5 days); one week during Christmas (7 days); and Father's Day (not overnight). This is a total average of 144.5 overnights which, for the purpose of the credit, are "days." Therefore, Thomas is entitled to a fifteen percent credit on his child support obligation. *See* Iowa Ct. R. 9.9 (stating 128-147 days receives a fifteen percent credit). Applying the credit to Thomas's child support obligation, we modify the decree to order Thomas to pay $818.55 per month ($963 – (963 x 0.15)).

### D.     MEDICAL EXPENSES.

The district court ordered that "the noncovered health care expenses for the children shall be divided by the petitioner paying 44 percent and the respondent paying 56 percent." Thomas contends, and Jaime agrees, that this is in error. The Iowa Court rule 9.12(5) provides

> The custodial parent shall pay the first $250 per year per child of uncovered medical expense up to a maximum of $800 per year for all children. Uncovered medical expenses in excess of $250 per child or a maximum of $800 per year for all children shall be paid by the parents in proportion to their respective net incomes.

The court made no finding justifying its variance from this rule. *See* Iowa Ct. R. 9.11. Thus, we modify the dissolution order to provide Jaime must pay the

first $250 per year per child of uncovered medical expenses. Expenses in excess of that amount shall be divided by Jaime paying forty-four percent and Thomas paying fifty-six percent.

### E. ATTORNEY FEES.

"Attorney fees are not a matter of right, but rather rest in the court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Factors the court considers include "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (quoting *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993)). We may also consider "whether the party making the request was obligated to defend the trial court's decision on appeal." *In re Marriage of Castle*, 312 N.W.2d 147, 150 (Iowa 1981). Accordingly, we order each party to pay their own attorney fees in this appeal.

### III. CONCLUSION.

We find the district court correctly ordered joint custody and awarded Jaime physical care of the children. We further find the court made an equitable division of the marital property, including transferring part of Thomas's IPERS account to Jaime. We find the court should have given Thomas an extraordinary visitation credit as set out in rule 9.9 and modify the decree to reflect a fifteen percent credit in his child support obligation. We also find the court should have required Jaime as the custodial parent to pay the uninsured medical expenses as set out in rule 9.12(5), and we modify the decree accordingly. We affirm the decree as modified.

Costs on appeal are assessed eighty percent to Thomas and twenty percent to Jaime.

**AFFIRMED AS MODIFIED.**