**IN THE COURT OF APPEALS OF IOWA**

No. 13-1156
Filed November 26, 2014

**IN RE THE MARRIAGE OF LONNIE J. MAYNES
AND CATHY MAYNES**

**Upon the Petition of
LONNIE J. MAYNES,**
          Petitioner-Appellant/Cross-Appellee,

**And Concerning
CATHY MAYNES,**
          Respondent-Appellee/Cross-Appellant.
_____

          Appeal from the Iowa District Court for Taylor County, Sherman W.

Phipps, Judge.


          A husband appeals from a decree of dissolution.  The wife cross-appeals.

**AFFIRMED ON BOTH APPEALS AS MODIFIED.**


          Jamie E. Kinkaid of Cordell Law, L.L.P., Omaha, Nebraska, for appellant.

          Michael J. Winter, Council Bluffs, for appellee.


          Heard by Mullins, P.J., and Bower and McDonald, JJ.

**MULLINS, J.**

Lonnie Maynes appeals the district court's decree of dissolution of his marriage to Cathy Maynes. He contends the district court erred in (1) finding Lonnie dissipated marital assets and ordering him to pay Cathy half the dissipated funds, (2) dividing the marital property inequitably by incorrectly valuing and distributing several marital assets, (3) awarding Cathy spousal support inequitably, and (4) awarding Lonnie child support without imputing income to Cathy. Cathy cross-appeals contending (1) the award of spousal support should have been higher, (2) she should have been awarded physical care of the parties' minor child, and (3) Lonnie should have been ordered to purchase life insurance with death benefits to meet his spousal support obligation. Both parties request attorney fees.

Upon our review of the record, we find Lonnie did not dissipate marital assets in constructing a storage building for his business operations, and we affirm the district court in all other respects.

## I.     FACTS AND BACKGROUND PROCEEDINGS.

Lonnie and Cathy were married in 1994, but had lived together since 1984. Cathy has an adult son (born in 1984) from a prior relationship. The parties together have an adult daughter (born in 1993), an adult son (born in 1994), and a minor daughter (born in 2003.)

Lonnie farms and drives a truck. During most of the marriage, he worked very long hours, as much as one hundred hours per week. At the beginning of the marriage, Cathy operated a cleaning business and worked as a clerk at a

convenience store. The parties later agreed Cathy would stay at home with the children until they reached school age. Nevertheless, although their youngest is school aged, Cathy did not return to work.

In January 2012, Lonnie filed a petition for dissolution of the marriage. The court held trial over five days in December 2012 and January 2013. In its ruling and decree, the court specifically found that Cathy's testimony was generally not credible. It awarded the parties joint legal custody of the minor child but granted physical care to Lonnie with visitation to Cathy. It ordered Cathy to pay Lonnie $146 per month in child support. It divided the substantial marital estate and ordered Lonnie to pay Cathy $1500 per month in spousal support for a period of seven years. The court also found that prior to filing the dissolution action Lonnie dissipated marital assets by constructing a storage building on the parties' land, and ordered Lonnie to pay Cathy half the cost of construction. Lonnie appeals from the decree and Cathy cross-appeals.

## II. SCOPE OF REVIEW.

We review de novo an action to modify a dissolution decree as it is heard in equity. Iowa R. App. P. 6.907; *In re Marriage of Brown*, 778 N.W.2d 47, 50 (Iowa Ct. App. 2009). Because of its ability to see and hear witnesses firsthand, we give weight to the factual findings of the district court, especially in its assessments of credibility, though we are not bound by those findings. Iowa R. App. P. 6.904 (3)(g). Case precedent has little value as we must base our decision on the particular circumstances of the case before us. *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002).

## III.    ANALYSIS.

### A.    Property Division.

We examine the entire record and adjudicate anew the issue of property distribution.  *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). We will disturb the district court's ruling only when there has been a failure to do equity.  *Id.*  Marital property is divided equitably, considering the factors in Iowa Code section 589.21(5) (2011).  *Id.* at 678.  "An equitable distribution of marital property, based upon the factors in 598.21(5), does not require an equal division of assets."  *Id.* at 682 (quoting *In re Marriage of Kimbro*, 836 N.W.2d 696, 703 (Iowa 2013)).  "Equality is, however, most often equitable," and Iowa courts generally insist upon equal or nearly equal division of marital assets.  *Id.*  We keep in mind that "there are no hard and fast rules governing economic issues in dissolution actions."  *Id.*  Our decision depends on the particular facts relevant to each case.  *Id.*

Lonnie and Cathy owned substantial farmland, farming equipment, and trucking equipment.  Lonnie intends to continue farming and truck driving as his main businesses.  The district court awarded him the land and almost all the equipment and assigned him the debts associated with such property.  It awarded Cathy two vehicles, a bank account, and some personal property. Thus, the division of marital property resulted in Lonnie receiving net property valued at $1,608,957.18 and Connie receiving net property valued at $38,732.00.

The court ordered Lonnie to make an equalization payment to Cathy of $785,112.59, giving each party a net total of $823,844.59.[1]

### 1. Dissipation of Marital Assets in the Morton Building.

Lonnie contends the district court erred in finding he dissipated marital assets by constructing the Morton building and awarding Cathy half the funds spent on the building. The Morton building is a storage shed-type structure located on a two-acre parcel of land the parties owned in Taylor County, where the marital home also is located. Lonnie uses the Morton building for his farming and trucking operations. Lonnie took out a loan to finance the building, and it was constructed in early 2009. Lonnie and Cathy separated in February 2012, so while the building was under construction, both Lonnie and Cathy were living in the marital home on the same two-acre parcel in Taylor County. On November 21, 2012, shortly before the beginning of the dissolution trial in December 2012, Lonnie paid off the remaining balance on the construction loan, $29,790.68, using marital funds. The total cost of the building was $189,790.68. The district court found Lonnie had dissipated marital assets in building the Morton building stating:

> Lonnie borrowed $39,282 in order to construct the Morton building. Therefore, he apparently expended approximately $160,000[2] of the parties' joint assets in order to construct the

---

[1] The district court ordered Lonnie to make an initial payment of $250,000 within sixty days of the decree. It ordered Lonnie to pay the remainder of the settlement in annual installments of $28,250.77 continuing each year until the settlement is paid in full. It also ordered that the outstanding balance of the judgment accrues interest at a rate of 2.5%.

[2] Although the total cost of the building was $189,790, the court found Lonnie borrowed $39,282 and paid cash "approximately $160,000," which equals $199,282. We note the discrepancy but make no effort to reconcile the difference given our disposition of this issue.

building. The record reflects the building was built for Lonnie's convenience in the operation of his various business endeavors (trucking and farming) and continues to be used for operation of Lonnie's businesses. There is no evidence that Cathy had any input in the decision to construct the building or consented thereto.

. . . .

The Court also finds that the money spent for the Morton building was from joint funds, was spent solely for Lonnie's benefit, to his use, and will have a continuing value to Lonnie in the conduct of his business enterprises. The Morton building was a disposition of joint funds without joint consent of the parties. Cathy is entitled to one-half of the joint funds expended and/or converted into the Morton building (one-half total amount of $189,790.68 is $94,895.34).[3]

Lonnie contends the court erred in awarding Cathy half the cost of the Morton building because there was no evidence of dissipation of marital assets. He also contends the court erred in its assessment of the value of the property, ordering him to pay Cathy more than it found the building to be worth.

Dissipation of marital assets occurs where a spouse's conduct during the separation results in the loss or disposal of property otherwise subject to division at the time of the dissolution. *Kimbro*, 826 N.W.2d at 700-01. When an asset has been dissipated in contemplation of dissolution, the district court includes the asset in the marital estate and awards the asset to the spouse who wasted it. *Id.*

---

[3] The court affirmed its finding in its ruling on the parties' motions filed pursuant to Iowa Rule of Civil Procedure 1.904(2), stating:

[I]t is clear that Lonnie began planning for this dissolution quite some time before actually filing the Petition herein. He dramatically changed his entire pattern of living at a distinct point several years before filing the Petition. He quit working long hours, began involving himself with the daily care of the children, and began arranging his business affairs to his advantage upon filing of the Petition.

As discussed below, in our view, Lonnie began taking over more childcare responsibilities following Cathy's abdication of the minor daughter's care to the older daughter. He did reduce his work hours in order to do so.

at 701. The doctrine of dissipation does not apply if the spending spouse used the asset for legitimate household and business expenses. *Id.*

We apply a two-pronged test when analyzing claims arising under the dissipation doctrine. *Id.* The court must decide whether the alleged purpose of the expenditure is supported by the evidence and whether that purpose amounts to dissipation. *Id.* We identify dissipation using the following factors:

> (1) The proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure.

*Kimbro*, 826 N.W.2d at 701. Lonnie asserts, and Cathy does not contest, that the Morton building was used for Lonnie's business. This assertion is supported in the record by testimony that the building was used to store Lonnie's semi-truck, tractors, planters, and other farm equipment. The record discloses Cathy had nothing to do with the operation of Lonnie's business and did not participate in making business decisions. The district court also concluded the building added value to Lonnie's business operations.

In addition, construction on the building occurred in 2009, three years before the parties separated and Lonnie filed his dissolution action. For three years prior to the filing of the dissolution action, the marital unit—including Cathy—benefited from the increased productivity the Morton building presumably provided for Lonnie's business interests. Further, the record discloses Cathy and Lonnie lived a relatively frugal life—their largest expenditures and assets were farm and trucking equipment for Lonnie's business. The Morton building is not

atypical of the expenditures that were made in order for Lonnie to make a good income for the benefit of the marriage. Although the district court found Cathy did not give her consent to the use of the marital assets to construct the building, we find, upon our review of the appropriate factors to consider as to whether dissipation occurred, they weigh against a determination that Lonnie dissipated assets with the construction of the Morton building. *See id.*

The only argument of avail to Cathy is that Lonnie made a precipitous payment of the remainder of the debt on the building shortly before trial. Our supreme court discussed expenditures made very shortly before trial in *In re Marriage of Fennelly*, 737 N.W.2d 97 (Iowa 2007). In *Fennelly*, the husband in the dissolution accelerated his purchases on a joint credit card, charging over $20,000 in various expenses. *Fennelly*, 737 N.W.2d at 105. The supreme court found he dissipated marital assets by adding additional debt to the marital estate—in short, the parties' assets would eventually be needed to repay the debt created. *Id.* The case before us is distinguishable from *Fennelly* in that Lonnie used existing marital assets to pay down existing marital debt—he did not create new debt that would require payment from the remaining marital assets. There was therefore no loss or disposal of marital property because the payment of cash was offset by reduction of debt. Had he not done so, the debt would have been distributed between the parties in the division of property anyway. The expenditure also was related to a business purpose.

For the forgoing reasons, we conclude that Lonnie did not dissipate marital assets. Therefore, Connie is not entitled to a separate recovery of any

portion of the costs expended in the construction of the Morton building. We modify the decree accordingly.

## 2. Valuation of Union County Property.

Lonnie contends the district court erred in its valuation of a 271-acre parcel of land in Union County by relying on the testimony of Cathy's appraiser rather than that of Lonnie's appraiser. Lonnie's appraiser, Kenneth Mallas, testified the land was worth $1,418,574; Cathy's appraiser, Donald Kern, testified it was worth $1,768,200. The district court made the following findings:

> Lonnie's appraiser, Kenneth Mallas, was recommended by Rick Schmitz, the agricultural loan officer at First National Bank, and concluded the farmland was worth $1,418,574 as of May 31, 2012. Mr. Mallas appraises land primarily in Union, Adams, and Taylor Counties. He also owns farmland in Adams, Taylor, and Union counties, including one parcel that adjoins the smaller track of the parties' farm ground. Mr. Mallas testified he is very familiar with farmland and its value in Union County. Until two years ago, Mr. Mallas completed approximately two-thirds of First National Bank's appraisals. According to Mr. Schmitz, except for a change in banking regulations at that time, Mr. Mallas would have continued to appraise the majority of the farmland for First National Bank's loans. Mr. Schmitz recommended Mr. Mallas [to Lonnie] to appraise the parties' property because he knew Mr. Mallas was familiar with farmland in Union County, he'd had good luck with him in the past, and liked that Mr. Mallas uses comparables in the same county as the subject property and does not consider the highest or lowest sales in his appraisals. Mr. Mallas testified the value of farmland in Union County may have increased between 2 and 3 percent since he completed his appraisal. Mr. Schmitz corroborated Mr. Mallas' sentiment and believed the value of farmland in Union County increased between 3 and 5 percent since June 2012. Mr. Mallas is employed by a company owned by Lonnie's first cousin and has been so employed since 1994. Lonnie and Mr. Schmitz seem to have a long-standing business relationship that works to their mutual benefit. Mr. Schmitz, or his employer, stands to gain from supporting Lonnie's position in this case.
>
> Cathy's appraiser, Donald Kearn, concluded the parties' farm ground was worth $1,768,200 as of June 19, 2012. Mr.

> Kearn's primary business operations are in southwest Iowa. Mr. Kearn claimed the value of the property had increased 2.2 percent per month since June 2012 (or 13.2 percent at the time of Trial). However, in reaching this conclusion, he considered the value changes of farmland in Taylor, Pottawattamie, and Montgomery Counties. There was testimony from Mr. Mallas at Trial that the Union County farm the parties own is not similar to the land in Taylor, Pottawattamie, and Montgomery Counties and that land values can vary significantly even in the same county. Mr. Kearn has no relationship to either party, and the Court considers his appraisal to be much less subject to bias than the appraisal of Mr. Mallas or the opinions of Mr. Schmitz.

Lonnie asserts the court erred in relying on Kearn's testimony because both appraisers are qualified, and because Mallas had more experience with Union County farmland. He further argues "the court did not make a finding Kenneth Mallas lacked credibility."

"Although our review is de novo, we will defer to the trial court when valuations are accompanied with supporting credibility findings or corroborating evidence." *In re Marriage of Vieth*, 591 N.W.2d 639, 640 (Iowa Ct. App. 1999). Here, the court thoroughly weighed the relative expertise of the two appraisers. Although the court did not explicitly state it found Mallas lacked credibility, it found his appraisal was more susceptible to bias as a result of his personal business interests than Kearn's. This is a valid credibility determination that is supported by facts in the record. Kearn also testified Mallas's estimate was inaccurate because Mallas considered comparable property sales that occurred between immediate family members which, in Kearn's opinion, did not reflect the true market value of those properties. Kearn also generally used comparable property sales that were more recent than those Mallas used. Accordingly, we

defer to the trial court, and affirm its valuation of the Union County farmland consistent with Kearn's testimony.[4]

### 3. Income Tax Refund.

Lonnie contends the district court erred in ordering him to pay Cathy half the refund from their 2012 tax return. He contends the award is in error because the funds are used for the operation of the business. Cathy responds the issue was not preserved,

Lonnie borrowed $302,533 to pay the parties' 2012 income taxes. Both parties listed that loan as part of the marital debt. Distribution of that debt, therefore, was an issue both parties presented as subject to the district court's resolution. The court recognized that the presumed tax obligation was contingent on the processing and final determination by the Iowa and Federal tax authorities, leaving a possibility that after the tax returns were processed there could be a tax refund. If there were a refund of some portion of that tax that was paid by the proceeds of the tax loan, then any refund—i.e. reduction of that ultimate debt obligation—was subject to distribution by the court. With the issues of asset and debt distribution clearly before the district court, Cathy's argument that the issue was not preserved for appeal is misplaced. The district court ruled that if there were a tax refund, Cathy was entitled to one-half the amount of the

---

[4] With respect to the testimony that the value of the land had increased over the intervening years, the district court found, "[E]vidence as to the increase in value since that time was not as clear and appears to be a rough estimate. Because the evidence as to any increase is not clear, but speculative, it will not be considered by the Court. The Court concludes the farmland is worth $1,768,200." We find no reason to disturb this conclusion.

refund, and ordered Lonnie to make the payment accordingly. This division of the tax refund is not inequitable.

### B. Spousal Support.

"Whether spousal support is justified is dependent on the facts of the case." *In re Marriage of Hazen*, 778 N.W.2d 55, 61 (Iowa Ct. App. 2009). "Even though our review is de novo, we accord the trial court considerable latitude in making this determination and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996). The court considers the factors set out in Iowa Code section 598.21A(1) to determine the amount of spousal support.[5]

In applying the statutory factors, there are three types of spousal support the court may award. *In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa

---

[5] These factors include:
    a. The length of the marriage.
    b. The age and physical and emotional health of the parties.
    c. The distribution of property made pursuant to section 598.21.
    d. The educational level of each party at the time of marriage and at the time the action is commenced.
    e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
    f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
    g. The tax consequences to each party.
    h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
    i. The provisions of an antenuptial agreement.
    j. Other factors the court may determine to be relevant in an individual case.

2008). Traditional spousal support is payable for life or for so long as the spouse is incapable of self-support. *Id.* Rehabilitative spousal support is a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce. *Id.* Reimbursement support allows the spouse receiving support to share in the other spouse's future earnings in exchange for the receiving spouse's contributions to the source of that income. *Id.* "Property division and alimony must be considered together in evaluating their sufficiency. *In re Marriage of Griffin*, 356 N.W.2d 606, 608 (Iowa Ct. App. 1984).

The district court awarded Cathy $1500 per month in spousal support for seven years. Within seven years, the support obligation terminates on the earlier of Lonnie's death, Cathy's death, or Cathy's remarriage. Lonnie contends the district court erred in failing to include Cathy's imputed employment income in its calculations. He also contends the award was inequitable in light of Cathy's choice to remain unemployed and the substantial property settlement. Cathy cross-appeals arguing the award should have been higher and for longer duration.

### 1. *Equity of the Award.*

Lonnie contends the spousal support award is inequitable where the district court found Cathy was capable of full-time, minimum-wage work and yet chose not to work. He also argues the award was inequitable in light of the substantial property settlement. On her cross-appeal, Cathy also contends the spousal support award was inequitable and should have been higher. Cathy

complains that the court's support award is a hybrid that is neither traditional nor rehabilitative and that the court should have given her a larger award of traditional alimony payable until her death or remarriage.

Prior to trial, the parties stipulated Lonnie's yearly salary was $94,478. When the parties married, Cathy operated a cleaning business and worked as a check-out clerk at a convenience store. When their children arrived, the parties agreed that Cathy would be a stay-at-home parent until their youngest was school-aged. However, Cathy never did return to work. Cathy claims she has a number of health issues that affect her ability to work.[6] The district court made the following findings:

> Cathy has the possibility of employment close to home. . . .
> Cathy acknowledged that she could work as a maid if she did not have to lift a mattress. Cathy also testified that both before and after the dissolution proceedings started, she considered working the night shift at Casey's [convenience store] because she thought she could do the work even with her health problems. Although Cathy obtained an employment application from Casey's, she never made any other effort to obtain employment with Casey's or anywhere else while this dissolution was pending. Her present status as unemployed seems to be one she chooses rather than based on health problems, as she tries to imply.
> While Cathy has not been employed outside the home for a number of years, the Court concludes that she could earn at least

---

[6] The district court dismissed Cathy's claims of poor health, stating:
> Cathy has a fallen bladder, a rectal prolapse, and back problems. However, she is still able to bowl, jog, power walk, and lift less than 20 pounds. Cathy testified surgery is needed to correct her fallen bladder and rectal prolapse.
> . . . .
> Despite the fact that these dissolution proceedings have been pending since January 2012, Cathy has done nothing to treat her alleged health issues so she might be able to obtain employment or to obtain employment that will accommodate her alleged health issues. . . . Cathy's present status as unemployed appears to the Court to be a status she voluntarily elects and prefers.

minimum wage ($7.25 per hour) and work 40 hours per week. In determining Cathy's ability to pay child support and her need for alimony, the Court will calculate Cathy's annual income at $15,080 ($7.25 per hour x 40 hours per week x 52 weeks per year).

In awarding the spousal support, the district court stated:

> The Court believes that Cathy will need some financial assistance to become self-supporting. By all accounts, the parties do not live an extravagant lifestyle. There is no reason that Cathy should have a better standard of living now than the parties enjoyed during their marriage.
>
> . . . .
>
> While the Court concludes an alimony award is appropriate in this case because of Cathy's absence from the job market, the question is how much alimony should she be awarded and for how long. . . . After considering Lonnie's stipulated income, Cathy's ability to become employed full-time, and the property settlement herein, the Court concludes Lonnie should pay Cathy alimony of $1,500 per month for seven years.

(Internal citations omitted.)

By its language, we regard the court's order to be for rehabilitative spousal support, which continues for a limited period of time allowing the supported spouse to resume self-support. *See Becker*, 756 N.W.2d at 826. Specifically, the court stated Cathy would need "some financial assistance to become self-supporting." Cathy and Lonnie were married for nineteen years. At the time of the dissolution, he was fifty-three and she was forty-nine years old. They are both in reasonably good health. Cathy is able to work full-time despite her asserted health problems. Cathy did work as a cleaner and a convenience store clerk before their marriage, and could return to similar work. The court explicitly stated it considered Cathy's ability to become employed full-time. It also projected her income to be $15,080 per year based on the minimum wage. Cathy also received an equal portion of the substantial marital estate in the

property division, which she will be receiving in cash equalization payments, rather than items of real or personal property. Neither she nor Lonnie have any education beyond high school, and they are unlikely to obtain more. The parties lived frugally during their marriage, and Cathy could maintain a comparable standard of living on her minimum-wage salary and the substantial property award. We find no inequity in the court's determination of the amount or duration of the spousal support award.

### 2. *Life Insurance for Spousal Support Obligation.*

Cathy contends the district court should have ordered Lonnie to maintain life insurance with death benefits to secure his spousal support obligation should he die prior to the end of the seven years. Cathy raises no further argument than that it is common for courts to so order. The court specifically stated the obligation terminated upon Lonnie's death. We find nothing inequitable in this, especially as the spousal support award is limited to just seven years as rehabilitative support.

### C. Child Custody.

In matters of child custody, the first and governing consideration of the court is the best interests of the child. Iowa R. App. P. 6.904(3)(o). Prior cases have little precedential value, except to provide a framework for analysis; we must base our decision on the facts and circumstances before us. *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992). The Iowa Code provides a nonexclusive list of factors the court shall consider in determining a custodial arrangement. *See* Iowa Code § 598.41(3). In addition to the statutory factors,

the court also must consider the factors identified in *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974), in determining the award of physical care.[7] *See Will*, 489 N.W.2d at 398. "The ultimate objective of a physical care determination is to place the child in the environment most likely to bring him to healthy mental, physical, and social maturity." *McKee v. Dicus*, 785 N.W.2d 733, 737 (Iowa Ct. App. 2010). The question of physical care must be determined based on what is in the best interest of the child, not what is fair to the parents. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Stability and continuity in caregiving are primary factors in determining an award of physical care. *Id.* at 969. Past caretaking patterns, including primary caregiving, weigh heavily in custody matters. *Id.*; *In re Marriage of Decker*, 666 N.W.2d 175, 178-180 (Iowa Ct. App. 2003).

---

[7] These factors are:
1. The characteristics of each child, including age, maturity, mental and physical health.
2. The emotional, social, moral, material, and educational needs of the child.
3. The characteristics of each parent, including age, character, stability, mental and physical health.
4. The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
5. The interpersonal relationship between the child and each parent.
6. The interpersonal relationship between the child and its siblings.
7. The effect on the child of continuing or disrupting an existing custodial status.
8. The nature of each proposed environment, including its stability and wholesomeness.
9. The preference of the child, if the child is of sufficient age and maturity.
10. The report and recommendation of the attorney for the child or other independent investigator.
11. Available alternatives.
12. Any other relevant matter the evidence in a particular case may disclose.

*Winter,* 223 N.W.2d at 166–67.

The district court awarded the parties joint custody and Lonnie physical care of the parties' minor daughter, C.M. C.M. was nine years old at the time of trial. In her cross-appeal, Cathy contends the court should have awarded her physical care.

When the parties' two older children, Cayla (born 1993) and Clelland (born 1994) were young, Cathy did not work but provided all their care and managed the household. During that time, Lonnie worked as much as one hundred hours per week and did not spend much time caring for the children. C.M. was born in 2003, and Cathy continued to be the primary childcare giver until C.M. reached school age. When C.M. started going to school, Cathy began traveling to Osceola, about an hour away, several days each week to gamble at a casino. At trial, Cathy testified she was still traveling to Osceola to gamble two or three times a week. The district court found that when Cathy began gambling regularly, she delegated most of C.M.'s care to her older daughter, Cayla. Lonnie testified that since C.M. was five, Cathy has had very little involvement in caring for her. Cayla was responsible for cooking for C.M., helping her with her homework, doing her laundry, and driving her to and from school or extracurricular activities.

At the same time, Lonnie began cutting back his work hours to spend more time with C.M. and began taking over more of her care. Thus, for the three or four years prior to trial, C.M.'s primary caregivers have been Lonnie and Cayla. In 2011, Cayla moved away to attend college, and Lonnie became C.M.'s primary caregiver. The temporary pre-dissolution order also placed C.M. in

Lonnie's care. By all accounts, C.M. is thriving under this arrangement. She is involved in several sports and extracurricular activities. Lonnie is the parent who takes her to these events and attends them with her; Cathy rarely attended such events. Lonnie and C.M. continue to live in the marital home where C.M. has always lived. Lonnie has scheduled and attended her doctor and dental appointments and haircuts. He takes her to church. C.M. is doing very well in school and has had no absences or tardy days since being in Lonnie's care. Lonnie encourages C.M. to pursue higher education, and C.M. looks to Cayla as a role model in going to college. Cathy did not encourage Cayla or Clelland to go to college.

In the three or four years prior to trial, Lonnie cut back his trucking hours so that he is able to take C.M. to school in the morning and pick her up in the afternoon. He does not need to use any other child care provider except during planting and harvesting times. At planting time in the spring, he is busy for about four weeks; at harvesting time, he is busy for about six to seven weeks. During these times, he has a large extended family support network to help him, including his brother, sister, and mother. C.M. has cousins to play with around the same age and is close with her extended family. Lonnie also takes C.M. to visit with Cathy's mother.

Although they are both away at college, Cayla and Clelland maintain a close relationship with C.M., especially Cayla. Cayla talks daily with C.M. Cayla and Clelland regularly come home on weekends to see Lonnie and C.M. Lonnie takes C.M. to Maryville, Missouri, where Cayla and Clelland go to college, once a

week to have supper with them. Cayla and Clelland have had a rocky and hostile relationship with Cathy and are now estranged from her.[8] They described Cathy as being verbally abusive to them and C.M. They testified Cathy swears and smokes in front of them and C.M. Cathy testified that if she had physical care, she would help maintain C.M.'s relationship with her siblings, but the district court did not find that claim credible. Lonnie testified he was concerned Cathy would not allow C.M. to have contact with her siblings, especially with Clelland. Cathy also testified at the trial she had been dating someone since June 2012 and has allowed her paramour to spend time with C.M. Lonnie testified he has not dated anyone through the dissolution proceeding.

Although Cathy was the primary childcare and housework provider throughout most of the marriage, it appears over the last few years she has prioritized her entertainment over her daughter's care. She has not been much involved in C.M.'s care since C.M. started school. We are also persuaded by the record and the district court's credibility determination that Cathy will not support and promote C.M. having frequent contact with her siblings, relationships which have been particularly important to C.M. Lonnie has been providing stable, consistent, thoughtful, and nurturing care, clearly showing C.M. is his priority, and she is thriving under this arrangement. We are convinced C.M.'s interests are best served by maintaining her physical care with Lonnie. This is the

---

[8] The court found Cayla and Clelland have repudiated Cathy and did not order Cathy to contribute to payment of their post-secondary education costs. The court did order Lonnie to pay one-third of the costs. Lonnie had already been paying their full college costs.

environment most likely to bring her to healthy mental, physical, and social maturity. *See McKee*, 785 N.W.2d at 737.

Cathy further contends that when Lonnie is in need of child care—particularly during his busy planting and harvesting times—she should be given the right of first refusal, rather than employing a third-party caregiver. It is clear from the record that Lonnie does not often need regular childcare and when he does he relies on his family with whom C.M. is close, an arrangement that appears beneficial and agreeable to C.M. as well. The court did not order Lonnie to give Cathy a right of first refusal and Cathy has reasonable visitation time. We see no reason to disturb the existing arrangement.

Cathy also complains that she should be able to have private telephone conversations with C.M. on a daily basis. She asserts in the past, conversations with C.M. are placed on speakerphone. Although Cathy raised this complaint in her 1.904(2) motion to the district court, the court did not make any specific provision in the decree or 1.904(2) motion ruling for phone contact between Cathy and C.M. Our court has modified a custody arrangement where a mother removed the telephone from the home when she left so the children could not call their father or grandparents,[9] intercepted mail to the children from the father, and took away gifts the father gave to the children. *Downing*, 432 N.W.2d at 694. Our court has also modified a physical care arrangement where a mother refused to let the father speak to the child over the telephone, failed to give the child the

---

[9] In this case, one of the children suffered from a medical condition which could potentially require emergency medical treatment and the mother's removal of the telephone made placing a 911 call impossible. *In re Marriage of Downing*, 432 N.W.2d 692, 694 (Iowa Ct. App. 1988).

father's letters, failed to share information about the child's health and education, and refused to give the father additional visitation. *Marriage of Nelson*, No. 02-1096, 2003 WL 1970399 at *1 (Iowa Ct. App. April 30, 2003). However, Cathy does not cite any case involving less serious obstructions on contact, nor does she cite any facts in the record indicating interference of such severity is occurring in her telephone contact with C.M. Accordingly, we are not persuaded to add the requested provision and affirm the custody and care arrangement as ordered.

### D. Child Support.[10]

Courts apply the Iowa Child Support Guidelines set out in Chapter 9 of the Iowa Court Rules in determining the amount of child support. The court may not deviate from the amount of child support yielded by the guidelines without a written finding that the guidelines would be unjust or inappropriate. *McDermott*, 827 N.W.2d at 684. In applying the child support guidelines, the court must determine the parents' monthly income from the most reliable evidence presented. *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). In so doing, the court may impute income. *See* Iowa Ct. R. 9.11(4).

Lonnie contends the district court erred because, although it awarded Cathy $1500 per month in spousal support and imputed her income as

[10] Cathy contends Lonnie did not preserve this issue for appeal, asserting she could not "find a place in the record or in post-trial motions where this issue was preserved." In their proposed child support guideline calculations, the parties gave two different estimates for Cathy's total income. The parties thus placed the determination of their income as a fact in issue in the case and the court's ruling addressed it. The issue was preserved.

approximately $1256.67[11] per month, it only considered her imputed income in determining child support. He contends the court should have included the spousal support in Cathy's income for the purpose of calculating her child support obligation.

In *In re Marriage of Lalone*, 469 N.W.2d 695, 697 (Iowa 1991), the district court considered the amount of alimony paid to the custodial parent in determining the noncustodial parent's child support obligation because to do otherwise would have resulted in "substantial injustice" to the noncustodial parent. Our supreme court found that the guidelines give discretion to the district court in setting child support, "if the court finds such adjustment necessary to provide for the needs of the children and to do justice between the parties under the special circumstances of the case." *Lalone*, 469 N.W.2d at 697. In *In re Marriage of Miller*, 475 N.W.2d 675, 679-80 (Iowa Ct. App. 1991), this court, citing *Lalone*, found the trial court acted within its discretion where it did not consider the noncustodial parent's alimony obligation in calculating his child support obligation. The trial court did not find that including the alimony obligation would result in a substantial injustice to the paying parent. *Miller*, 475 N.W.2d at 680.

Here, the court specifically found, "[T]he Court does not believe it would be fair or equitable to consider alimony in determining Cathy's child support obligation." The district court was thus within its discretion to exclude the alimony

---

[11] Monthly income based on yearly salary of $15,080, or full time at minimum wage.

from Cathy's income in calculating the child support obligation. We will not disturb the court's ruling.

### E. Attorney Fees.

"Attorney fees are not a matter of right, but rather rest in the court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Factors the court considers include "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (quoting *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993)). We may also consider "whether the party making the request was obligated to defend the trial court's decision on appeal." *In re Marriage of Castle*, 312 N.W.2d 147, 150 (Iowa 1981). Lonnie and Cathy will each pay their own attorney fees and one half of the court costs on appeal.

## IV. CONCLUSION.

We conclude the district court improperly found that Lonnie dissipated marital assets. We modify the decree to eliminate the requirement that he reimburse Cathy for the expense of the Morton building. We further find the district court properly valued and divided the marital property, including the Union County property and the tax refund, and correctly ordered spousal and child support. The district court also correctly awarded care of the minor child to Lonnie. Accordingly, we affirm the decree as modified. Each party will pay their own attorney fees and half of the court costs on appeal.

**AFFIRMED ON BOTH APPEALS AS MODIFIED.**