Thomas A. McKEE, Plaintiff–Appellee,

v.

Lora DICUS n/k/a Lora Myott,
Defendant–Appellant.

No. 09–1945.

Court of Appeals of Iowa.

May 26, 2010.

Harold K. Widdison, Sioux City, for appellant.

Scott L. Bixenman of Murphy, Collins & Bixenman, P.L.C., LeMars, for appellee.

Considered by SACKETT, C.J., and EISENHAUER and MANSFIELD, JJ.

MANSFIELD, J.

Lora Myott appeals from the district court's order granting Thomas McKee physical care of their son. She contends that she should have been granted physical care and challenges the calculation of child support. We affirm.

## I. Background Facts and Proceedings.

Lora and Thomas met in 1983 and had an on-again, off-again relationship for several years, but never married. The parties ended their romantic relationship prior to July 1994, when their second son, Austin, was born. After his birth, Thomas did not want a relationship with Austin. In 1995 a district court order, entered at the request of the State of Iowa, established paternity and ordered Thomas to pay child support and provide health insurance for Austin. Thomas did pay child support, but did not provide health insurance even though he had it available through work. Austin lived with Lora for the following fifteen years. During the

first ten of those years, Thomas had essentially no relationship with Austin. As he put it, "I was an a——hole. I do not know. I was a workaholic. Just worked."

Lora, however, encouraged Austin to have a relationship with his father. When Austin was ten years old, Lora began bringing Austin to Thomas's work in order to facilitate contact between the two. After that, Thomas had sporadic contact with Austin, which Thomas described as "once a month, not even that." Approximately two years before trial, Austin started spending more time with Thomas. During the summer of 2008, Austin had extended visitation with Thomas.

As Austin was growing up, Lora moved a number of times. As a result, Austin changed residences and schools several times. When Lora and Austin were living in Sergeant Bluff and Austin was in seventh/eighth grade, Lora met Mike Myott, whom she eventually married. During one somewhat difficult time for Austin, Lora was taking Austin every day after school from Sergeant Bluff to Storm Lake, so she could stay overnight with Mike, then returning the next morning to drop Austin at school. Eventually though, Lora and Mike moved with Austin to Hinton. At the time of trial, Austin was still attending the Hinton schools, although his mother and stepfather had moved to Sergeant Bluff. According to Austin, Lora and Mike's residence was out in the country and has some characteristics of a "junkyard." In addition to Austin, the residence was shared by Lora, Mike, Lora's grown son Jeff, Jeff's five-year-old son, nine dogs, and a horse.

Thomas, meanwhile, lives in Beresford, South Dakota. Thomas has been self-employed for twenty-one years. He is a part-owner of Jet Services Center, Inc., a truck stop, repair shop, towing business, and metal crushing business located in Beres-

ford. He works "at least sixty hours" per week, and stated that he usually goes to work at 8:00 to 8:30 a.m. and comes home between 9:00 p.m. to 2:00 a.m. Thomas has a two-bedroom house in Beresford. One of the bedrooms is for Austin when he is staying there.

As Thomas's time with Austin has increased, he has involved Austin with his work and taught him many things related to the business. They enjoy working on cars together.

On November 25, 2008, Thomas filed a petition requesting physical care of Austin. Thomas then began exercising regular visitation with Austin. The parties agreed to a temporary visitation schedule, whereby physical care of Austin would remain with Lora, and Thomas would have visitation with Austin every other weekend. Austin spent a significant portion of the 2009 summer with Thomas.

Trial was held on November 10, 2009. Austin, who was fifteen years old and a sophomore in high school, testified that he loved his mother but wanted to live with his father. He enjoyed working on cars and going to work with his father.

Thomas testified that if Austin lived with him, he would attend a school in Beresford that is located about three blocks from the house, within walking distance. Thomas also acknowledged that he would not generally make meals for Austin, but stated that he was old enough to take care of his own meals.

Lora testified that she believed Austin's desire to live with his father was sincere, but that it was based, in part, upon the fact that there were no rules in Thomas's house and no supervision. She also expressed concern about hundred dollar bills that Thomas had bestowed upon Austin, although Thomas claimed this was for work he performed at the truck stop. Ad-

ditionally, Lora was concerned that if Austin lived with Thomas, he would not have a "home life," but instead his life would revolve around Thomas's work.

As of the time of trial, Thomas had not attended any of Austin's school events, including teacher/parent conferences, and had only attended one of Austin's doctor's appointments, which was because Austin had broken his wrist while in Thomas's care.

On December 10, 2009, the district court entered a decree. The district court found that Lora has been Austin's primary caregiver since his birth and "has been exemplary in her treatment of Austin's desire to have meaningful contact with his father." As to Austin's testimony, the court found, "It is clear that this action was prompted in large part by Austin's wishes to live with his father." The court ultimately concluded that it was in Austin's best interests to be allowed to live with his father, stating, "The Court is convinced that Austin will be best served if he can have a significant period of time to spend with his father, which will replace that void left by Tom's past absences." The court therefore granted joint legal custody to Lora and Thomas and physical care to Thomas. Additionally, Lora was ordered to pay child support. Lora appeals.

## II. Standard of Review.

We review child custody and support orders de novo. Iowa R.App. P. 6.907; *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). However, we recognize that the district court was able to listen to and observe the parties and witnesses. *In re Marriage of Zabecki*, 389 N.W.2d 396, 398 (Iowa 1986). Consequently, we give weight to the factual findings of the district court, especially when considering the credibility of witnesses,

but are not bound by them. *Sullins*, 715 N.W.2d at 247. Our overriding consideration is the best interests of the child. *In re Marriage of Bevers*, 326 N.W.2d 896, 898 (Iowa 1982).

## III. Analysis.

### A. Initial Custody Determination or Modification Action.

At the outset, the parties disagree whether this is an initial custody determination or a modification action. The question is important here. If this case is treated as a modification action, then Thomas had the burden of proving (1) a material and substantial change in circumstances and (2) his ability to provide superior care. *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). The district court observed:

> Interestingly, here, there was no previous custodial order and this is an initial action for custody but the Court is being asked by the Plaintiff to essentially award him custody of the parties' remaining minor child which would in essence be a modification of what has been the de facto custodial arrangement between the parties for the past 15 plus years. So in some respects, the Court must view this as a type of modification albeit unofficially. Despite this setting, the Court must make its determination such that it concludes the issues before it in the best interests of the child.

In other words, the district court acknowledged that the case had some aspects of a modification proceeding; nevertheless, it applied the law for initial custody determinations. Lora argues that this was error, although she provides no legal authority for her position.

Potentially, Lora could rely on Iowa

Code section 600B.40 (2007),[1] which provides:

> The mother of a child born out of wedlock whose paternity has not been acknowledged and who has not been adopted has sole custody of the child unless the court orders otherwise. If a judgment of paternity is entered, the father may petition for rights of visitation or custody in an equity proceeding separate from any action to establish paternity.

The 1995 order established paternity and ordered support, but did not address custody. Until filing the present action, Thomas did not seek custody or visitation rights. As a result, Lora was entitled to sole custody until a court ordered otherwise. *See In re B.L.*, 470 N.W.2d 343, 346 (Iowa 1991) ("We construe section 675.40 as placing sole custody of a child born out of wedlock with the mother unless the father steps forward and acknowledges paternity of the child within a reasonable time. Once acquired, the mother retains sole custody until a court orders otherwise."). Yet this does not mean that Lora had the equivalent of an actual custody order in place. If section 600B.40 had that effect, we believe it would be worded differently. It would say that the father may petition for "modification of custody," rather than petitioning for "custody" itself.[2]

We recognize that the existing custodial arrangement has been longstanding here. Lora has been caring for Austin for fifteen years. However, where there has been no prior custody order, we conclude the proper course of action is not to treat the proceeding as a modification, but rather to consider the previous pattern of caregiving an important factor in an initial custody determination. *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (discussing that in making a physical care decision an important factor is the previous pattern of caregiving).

## B. Physical Care.

 Lora asserts that the district court should have awarded her physical care of Austin.[3] In determining physical care of a child, the courts are guided by the factors enumerated in Iowa Code section 598.41(3), as well as other nonexclusive factors enumerated in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). *See Hansen*, 733 N.W.2d at 698 (holding that the factors enumerated in section 598.41(3) are relevant in making a physical care determination). The ultimate objective of a physical care determination is to place the child in the environment most likely to bring him to healthy mental, physical, and social maturity. *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct.App.1996). As each family is unique, the decision is primarily based on the particular circumstances of each case. *In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995).

Lora specifically argues that Thomas was granted physical care based upon one factor—child preference. She further points out that she has been Austin's primary caregiver and has encouraged a father/son relationship between Thomas and Austin, whereas Thomas has not been in-

1. Formerly Iowa Code section 675.40.

2. The rationale behind imposing a heavy burden on the petitioner in modification proceedings is that the other parent previously "has been found to be the better parent." *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct.App.2002). But in a case like this, where no prior custody order has been entered, we have no such finding.

3. Neither parent argues for joint physical care, which appears to be impractical due to the physical distance between the two parental residences (approximately sixty miles).

volved with the daily care of Austin and is not supportive of her relationship with Austin. Finally, she argues that under Thomas's care, Austin will be unsupervised most of the time because Thomas works until between 8:00 p.m. and 2:00 a.m. each night and Austin will have to prepare his own meals.

We agree with Lora that Austin's preference was apparently an important factor in the district court's physical care decision. "Deciding custody is far more complicated than asking children with which parent they want to live." *In re Marriage of Behn*, 416 N.W.2d 100, 101 (Iowa Ct.App.1987). "When we speak of what is best for the child, we do not mean that which the child wants[.]" *In re Marriage of Ellerbroek*, 377 N.W.2d 257, 258 (Iowa Ct.App.1985) (quoting *Lursen v. Henrichs*, 239 Iowa 1009, 1015, 33 N.W.2d 383, 386 (1948)). The preferences of a child, while not controlling, are relevant. *Id.* In determining what physical custody arrangement is in the best interests of a child, one of the factors the court shall consider is "whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity." Iowa Code § 598.41(3)(f). In determining the weight to be given to a child's wishes, we consider the following factors: (1) the child's age and educational level; (2) the strength of the child's preference; (3) the child's relationship with family members; and (4) the reasons the child gives for his decision. *Behn*, 416 N.W.2d at 102.

Austin was fifteen years old and a high school sophomore at the time of trial. He expressed a strong preference to live with Thomas. His testimony indicated he desired a close relationship with his father and enjoyed the activities they did together. He said that he loved his mother, and although he characterized his relationship with his mother and step-father as a rollercoaster, the district court found this may be posturing in order to be able to live with his father. After analyzing these factors, we find some weight should be given to Austin's preference.

But we must also examine other factors. Lora has been Austin's primary caregiver for fifteen years. She alone has been responsible for all of Austin's daily care, including educational activities and medical care, in which Thomas has chosen not to participate as of yet.

The district court did not articulate precisely why it felt it would be in Austin's "best interests" to be with Thomas, although clearly it felt that way.[4] This is to a degree understandable. Often trial judges who see the witnesses in a custody dispute come away with a gut feeling that one parent is a better fit than the other, though it may be difficult to explain the underlying reasons. Certainly it is preferable if the decree sets forth those reasons, even if that may not be literally required by the statute. *Cf.* Iowa Code § 598.41(5)(a) (providing that if the court denies a request for *joint* physical care, "the determination shall be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child").

Upon considering all the relevant factors, we affirm the district court. The

---

**4.** Although the district court cited Austin's preference for living with his father, this was not the exclusive basis for its physical care determination. As the court explained, "While the Court must ultimately be the one who determines what is in Austin's best interest and it must not merely let a child decide, here, there is good reason to follow Austin's wishes and it is in his best interest to do so."

record indicates living with Thomas would offer Austin several advantages. First, he would have a stable, uncomplicated living arrangement. Austin's mother has made numerous changes of residence. Lora's current residence includes Lora's unemployed spouse (Mike), her adult son (Jeff) who anticipates spending some time in jail on OWI-related issues, Jeff's five-year-old son whom Lora admits she is now raising, and a number of animals. The record indicates that Austin finds these living arrangements stressful. Second, it appears living with his father would give Austin the opportunity to learn a trade. Thomas has a successful business in which Austin seems to enjoy working. Third, at this stage in his life, when he is only a few years from high school graduation and the age of majority, Austin connects with his father better than with his mother. We do not agree with Lora that this is a "Disneyland" scenario where Austin prefers his father simply because he has more fun and less structure there. Rather, it appears that at this stage in his life, where Austin cannot have the daily involvement of both a father figure and a mother figure at the same time, he would benefit more from having a father figure. As the district court put it, "Austin will be best served if he can have a significant period of time to spend with his father, which will replace the void left by Thomas's absences." *See Hansen*, 733 N.W.2d at 700 ("The court should be alert, however, to situations where the emotional bonds between children and a parent who has not been the primary caregiver are stronger than the bonds with the other parent.").

Accordingly, giving deference to the district court's ability to see and hear the witnesses, we affirm its physical care determination. One should not overlook the obvious point that Lora, not Thomas, deserves the credit for raising Austin so far. However, child custody determinations are not ultimately about what is fair to the parents. To some extent, perhaps, Lora's arguments miss this point, as exemplified by the following cross-examination of Thomas:

Q. [Y]ou stated that you weren't the father that you were supposed to be, correct? A. Correct.

Q. So why is it fair now that once you're ready to be a father, it's okay for Austin to come live with you? A. We— back to the same thing, we are here because Austin does not want to live with his mom. What makes it right or wrong, there's no right answer for that. Austin does not want to live with his mom.

## C. Child Support.

Lora asserts that the district court incorrectly calculated the parties' net incomes for child support purposes. The district court determined that for child support purposes, Lora's income was $24,960 and Thomas's income was $66,000. Lora was employed as a secretary earning twelve dollars per hour, working forty hours per week. Thomas earned a salary of $30,000 annually from his business, but it was an S corporation that also generated earnings taxable to Thomas. In 2008, Thomas reported a total $97,009 in salary and profit on his tax returns, but he testified it was an unusual year due to the high prices for scrap metal. He testified that 2009 was going to be a down year due to the condition of the economy. The district court therefore averaged the prior three years of income (2006–2008) to determine Thomas's income for child support purposes. This produced the $66,000 figure.

■ Before applying the child support guidelines, the district court must determine the current net monthly income of the parents. *In re Marriage of Hagerla*,

698 N.W.2d 329, 331 (Iowa Ct.App.2005). Net monthly income is defined as the gross monthly income less specifically enumerated deductions. *In re Marriage of Powell,* 474 N.W.2d 531, 533 (Iowa 1991). This determination must be made based upon the most reliable evidence presented. *Id.* at 534.

 Lora first asserts that because the district court averaged Thomas's income, it should have averaged hers. She cites no legal authority in support of her argument. *See State v. Scovill,* 224 N.W.2d 221, 223 (Iowa 1974) ("We are under no compulsion to review any assignment of error when the complaining party cites no authority in support of his argument."). Further, Lora has a set monthly wage, which generally does not support income averaging. *See Powell,* 474 N.W.2d at 534 ("Where the parent's income is subject to substantial fluctuations, it may be necessary to average the income over a reasonable period when determining the current monthly income."); *Hagerla,* 698 N.W.2d at 332–33 (finding that income averaging should not be used for a parent who was employed at a wage and fluctuations in income were the result of earnings from prior employment).

Additionally, Lora asserts that Thomas's income should be increased because he underreported his income by ten percent. However, Lora mischaracterizes Thomas's testimony. Thomas did not testify that he underreports his income by ten percent, but did testify that he was paid in cash at times and reported ninety percent of the cash payments. We do not condone any non-reporting of income. However, at the same time, the testimony indicated that because of the truck stop's Schedule S status, Thomas's tax returns attributed income to him that he did not actually take out of the business. On the whole, we conclude that the district court determined Thomas's income from the most reliable evidence presented and find no reason to disturb its calculations.

### D. Attorney Fees.

Lora asserts that she should have been awarded trial attorney fees. The district court found each party should be responsible for his or her own attorney fees. An award of trial attorney fees rests in the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *In re Marriage of Wessels,* 542 N.W.2d 486, 491 (Iowa 1995). Lora simply asks for us to reverse the district court, but does not point out any reason why the district court should be reversed nor assert that the district court abused its discretion in any manner. We find no abuse of discretion and affirm on this matter.

Lora also requests appellate attorney fees. An award of attorney fees is not a matter of right, but rests within the court's discretion. *In re Marriage of Benson,* 545 N.W.2d 252, 258 (Iowa 1996). In determining whether to award appellate attorney fees, we consider the parties' financial positions and whether the party making the request was obligated to defend the trial court's decision on appeal. *Id.* After considering the appropriate factors, we decline to award appellate attorney fees. Costs on appeal are assessed to Lora.

**AFFIRMED.**