# IN THE COURT OF APPEALS OF IOWA

No. 20-0294
Filed November 30, 2020

**DAVID ERIC WOLFF,**
     Plaintiff-Appellee,

**vs.**

**MINDY ANN WILSON n/k/a MINDY ANN ENNIS,**
     Defendant-Appellant.

_____

     Appeal from the Iowa District Court for Webster County, Kurt L. Wilke, Judge.

     The mother appeals the denial of her application for modification of the physical-care arrangement of the parties' minor child. **REVERSED AND REMANDED WITH INSTRUCTIONS.**


     Alesha M. Sigmeth Roberts of Sigmeth Roberts Law, PLC, Clarion, for appellant.

     David Wolff, Fort Dodge, self-represented appellee.


     Considered by Doyle, P.J., and Mullins and Greer, JJ.

**GREER, Judge.**

Mindy Ennis, formerly Mindy Wilson, appeals the order denying her request to change the custodial arrangement she and David Wolff crafted by agreement regarding their child. As unmarried partners, Mindy and David had a child in 2006. In 2010, they agreed to a custody plan with the decree incorporating an award of joint legal custody and joint physical care of their child. The schedule they followed involved trading weeks every Monday after school. Citing several problems, in 2019, Mindy petitioned to modify the decree to award her physical care of their thirteen-year-old daughter. In January 2020, after a two-day trial, the district court denied the modification and, instead, ordered David to complete the Children in the Middle Program within thirty-days of the order. After she unsuccessfully moved to enlarge findings, Mindy appeals the denial of her request to modify the physical-care arrangement and requests appellate attorney fees. Failing to timely file a responsive brief and designation of parts of the appendix, our supreme court determined David waived his right to file a brief in the appeal.

*Factual Background.*

Mindy was thirty-four years old at the time of trial and she and her husband, Jeremiah, had been married for eight years. Mindy has lived in the same home for eleven years with the child she had with David. While Mindy is employed at a community health center as a front office supervisor, she is also involved in her community. In 2013, she and Jeremiah added another child to their family. David, also age thirty-four, lives with his fiancée Crystal, whom he has known for three years. They plan to get married sometime soon. Although David moved four times within the last three years, he has now purchased a home for his growing family.

Eight people reside in David's home, including the child involved here, Crystal's five children from a previous marriage, and a child David and Crystal had together. David has had several jobs and was unemployed for a bit, but for over the last year he has worked at the Social Security office as a clerk.

A primary motivation for Mindy's filing for modification stems from communication problems between David and her about parenting their child. David testified they navigate any communication bumps and have successfully raised their child for years with no serious issues. He contends that any issues that do arise stem from Mindy's unwillingness to talk to David or answer his calls. He believes that Mindy talks to their child about him negatively and is encouraging her to want the change in physical care.

But Mindy complains that David does not follow the terms of the decree in various ways. Mindy points to examples in which David has not fostered the best interests of their child and has not effectively communicated as a co-parent. Pointing to the decree's requirements that they jointly make decisions, Mindy testified (1) David has been making all decisions about extracurricular activities, (2) David is rigid about the child's medical care and created a scene about a medical appointment Mindy scheduled, (3) David failed to tell her the child was in counseling with two different mental-health counselors, (4) David failed to notify her of his new address as required by the decree, and (5) David ignores the requirement that the parents are to be flexible to meet the best interests of the child unless it suits him.

Mindy also urged the district court to consider that David uses abusive techniques for discipline. Mindy described her discipline style as one where she

and the child talk about issues or she might take away the child's privileges. In contrast, Mindy learned that at David's home, the punishment employed requires that for several minutes, the children do "wall sits" where they have their legs at a straightened ninety-degree angle and lean against a wall or "assume a position" where they do the same maneuver but without the benefit of a wall. Other techniques require performing a "London Bridge" (a backbend) or standing on paint cans balancing things on their arms over a long time frame. On the child's phone, Mindy found a picture of bruises on the child's legs. The child explained she took the photograph because she thought no one would believe her. She told her mother and also testified that she was not standing in the position correctly and that David hit the back of her legs with a wooden stick causing the bruising. An investigation was done by the Iowa Department of Human Services (DHS), but the conclusion was that the allegations were unfounded—the report was not an exhibit at trial and no DHS investigator testified.

At trial, Mindy testified about their daughter's difficult relationship with David. Mindy offered that she encouraged the daughter to play video games with David or text him while she is away to help improve their strained relationship. On the weeks the child is at her father's house, she is not allowed to have her cell phone, which Mindy provides—a decision made by David alone. Over the past year, according to Mindy, the child has expressed a preference to be at Mindy's house the majority of time but she still wants to see her stepbrothers and her baby brother at David's house. The testimony of the child and Mindy reference David's controlling nature and how that impacts the child. For example, Mindy testified that David was upset that Mindy bought a new school backpack to replace one

that Mindy had bought some three years before. The child has to transfer items between the two backpacks to avoid upsetting David. There was anxiety about transferring the child's other possessions because they cannot be moved from home to home or David becomes upset.[1]

Other examples of the current strife related to considerations for the best interest of the child. When Mindy requested extended visitation time in the summer so that she and her daughter could travel to Texas, along with other extended family, to celebrate the birthday of a family friend traveling from Norway, David emphatically said no. Because the trip involved travel over David's birthday he refused to allow the trip. Yet when David has extended family arriving over Mindy's holidays, she is flexible and allows David extra time with the child. Text messages between the parties are contentious, and both parents suggest there is yelling when talking by telephone. The children are tape-recorded at David's home. David explained that the taping was to protect the children and the parent. Finally, all recognized this teenager was entering puberty. Yet David removed her bedroom door at his home. The child testified it was a punishment. David offered it allowed them to observe purported self-harm behaviors and kept her from isolating in her bedroom where he claimed she verbally assails herself with negative comments. Crystal offered this strange rationale:

> Because [the child] was inside doing the same thing [yelling negative words] to herself. She didn't lock the door. She put things in front of the door so we couldn't get it open. And when we opened the door, I told her, I said, [child], you're not doing this. And then there was [the child] not listening and doing things of opposite of what we were telling her purposely. And the door—she wanted the door shut. We said, No, you're opening up the door. She didn't want to listen. And

---

[1] Crystal described the child's clothing they bought as "our property."

I'm not kidding you, the entire night I had to wake up like every two hours. [The child] was shutting the door. [Child], open the door. It was cold. You have to leave your door open so the heat goes in. You know, the heat vents all work and stuff like that, but I just wanted to make sure she had enough heat in her room, because she's in the coldest part of the house when the wind blows a certain direction. So we're like, Keep your door open; it's going to keep you warm. And she kept shutting the door. We're like, [child], you need to listen. So she kind of pushed back.

Asked when the door could be put back up, Crystal noted, "Well, I mean, when she's ready to cooperate I guess is what it is, and we know that she does not get to control the house and she's no longer going to hide herself away to hurt herself."

Throughout the trial, Mindy maintained that David is controlling. She argued he schedules medical appointments without telling her, yet becomes angry if *she* sets up a medical appointment. At the same time, Mindy learned that David failed to communicate that he was taking their child to mental-health therapy. The counselor called Mindy by chance because the child was sick. Once Mindy learned of the counseling, David canceled the sessions and moved the child to another counselor. Interestingly, Mindy learned their child was having counseling sessions with a second counselor when the child asked the therapist for his business card, snuck it to school, and gave it to her younger sister to deliver to Mindy. When Mindy contacted each therapist, she learned David told them she objected to therapy for their daughter. Mindy also learned that the first counselor had a wrong address and last name for her, which explained why the counselor's letter about services had never arrived. Mindy suspected David of providing inaccurate information. To explain the counseling, David testified he felt the child was depressed and engaging in self-harm behaviors at his home, but he provided

no testimony or exhibit showing he communicated these important concerns to Mindy.

The day before the start of school, Mindy read a letter from the school that the child needed an immunization. Thinking she could get in more quickly, Mindy took the child to a doctor at the clinic where she works rather than the regular treating doctor David requires they use. David became irate that Mindy scheduled an appointment at her employer for the shot. Mindy testified David called and yelled at the medical staff and tried to cancel the appointment. Mindy had to prove to the medical staff that she was also able to schedule medical care for their child. David's excuse for his concern about the community clinic was provided in his testimony.

> Q. And what was your reason for not wanting [the child] to go there? A. It would not be an unbiased third party. It's her mom's place of employment. She's also a supervisor and she has direct access to her medical records. I don't think that's in [the child's] best interests, nor was there any reason to change her primary care provider.

Oddly, the decree required open access to the child's medical records, but David surmised that Mindy could alter the records.

With communication strained about medical care, David also refused to provide a copy of the medical insurance card to Mindy. His response to Mindy's request was the doctor's office had a copy. Mindy noted that the child's care might be impacted if they are not near the normal medical provider when care is suddenly needed, like in the instance of an accident. So Mindy obtained insurance through her husband's work to alleviate the concern.

Finally, Mindy also complains that David signs up their child for extracurricular activities without jointly discussing the plan. Mindy testified she is only told the child is signed up, when to be there and what she needs to pay for the activity. Still, Mindy confirmed that the activities were appropriate. On a minor note, Mindy outlined other communication difficulties with David. Often she has to refer David to the decree terms, and most communication is by text messaging because she complains David yells at her. Some text messages were not respectful. David refused to tell her where he was living with Crystal even though the decree required notice within thirty-days of a move. Mindy discovered the address from Crystal's ex-husband.

Supporting his argument that modification is not warranted, David addressed the strong relationship he has with his fiancée and offered into evidence photographs showing the combined family happily engaging in activities. Even before the modification filing, in a pro-active move, David and Crystal attended a blended family class at their church to help address issues arising when they pulled their separate families together. But David admitted the child told him she does not feel safe around him and this concern has been an issue addressed in their joint counseling. He blames Mindy for that mindset. While David described himself as a disciplinarian who is strict, he testified he only "smacked" his child once when she called her mother names. He also denied any physical punishment involving striking the child with other objects. With this summary, we address whether Mindy has met the standards for modifying custody.

*Modification of Custody.*

We review the district court's ruling on an application to modify de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). The best interests of the child is the "controlling consideration." *Id.* "Even though our review is de novo, we give weight to trial court findings of fact, especially when considering credibility of witnesses." *In re Marriage of Woodward*, 228 N.W.2d 74, 75 (Iowa 1975) (quoting *Zaerr v. Zaerr*, 222 N.W.2d 476, 477 (Iowa 1974)).

In her petition, Mindy narrowed the factors warranting a modification to three concerns: (1) David cannot provide the child stability, (2) David failed to include Mindy in decision-making or provide her with necessary medical information, and (3) there are allegations of abuse being investigated by DHS. At trial, Mindy also submitted that another change in circumstance was their thirteen-year old's preference to move to her home full-time. And while Mindy acknowledged that the DHS determined the allegations of physical abuse to be unfounded, she still characterized David's disciplinary style as abusive.

Instead of joint physical care, Mindy requested the district court grant her physical care and award David visitation on every other weekend along with shared holidays and time in the summer. David denied all allegations and specifically denied that a modification should occur.

> Courts are empowered to modify the custodial terms of a paternity decree only when there has been a substantial change in circumstances since the time of the decree, not contemplated by the court when the decree was entered, which was more or less permanent, and relates to the welfare of the child.

*Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002) (noting that discord between parents may warrant modification giving one parent physical care so as to achieve superior care for a child).

And Mindy bears a heavy burden to compel a change in custody. "The party seeking to modify a dissolution decree thus faces a heavy burden, because once custody of a child has been fixed, 'it should be disturbed only for the most cogent reasons.'" *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (quoting *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983)). "In determining which parent serves the child's best interests, the objective is to place the child in an environment most likely to bring the child to healthy physical, mental, and social maturity." *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct. App. 1996). Here, for many years the parties navigated a joint physical care plan. The considerations impacting whether a joint physical care plan is in a child's best interest are: (1) "stability, continuity, and approximation"; (2) the parents' ability to "communicate and show mutual respect"; (3) "degree of conflict between parents"; and (4) "the degree to which the parents are in general agreement about their approach to daily matters." *In re Marriage of Hansen*, 733 N.W.2d 683, 697-99 (Iowa 2007).

We glean from the district court's comments confirmation of David's controlling and rigid parenting style, in his communications with Mindy and their child, and his "my way or the highway" mentality. Yet the district court determined that Mindy had not met her burden of proof to show a substantial change in circumstances since the 2010 decree. Instead, the district court concluded, "While this court finds much to fault in David's co-parenting it is noted that the current

shared care arrangement has been in existence for the past nine years." Allowing David the benefit of the doubt going forward, the district court instructed him that "things must change." Listing those specific "things," the court directed that

> [t]here must be a complete cessation of disrespectful dialogue between the parties or towards each other in front of [the child]. The parties shall cooperate and keep each other fully informed regarding [child]'s welfare. David shall immediately provide Mindy with the insurance card for [the child]. The yelling in David's home must cease. David needs to understand that his notion of his way or the highway is not good co-parenting and won't be tolerated.

In factual findings, the district court described a picture of David's home, supported by all witnesses, that was "very regimented and everyone is subordinate to him." His controlling behavior extended to his dealings with Mindy. Addressing David's disciplinary style, the district court determined that "David does administer corporal punishment by requiring the offending children to stand on paint cans or in other positions of discomfort. There also appears to be a great deal of yelling on David's part in the home." Few comments pertained to Mindy's behavior in the district court decision.

Along with Mindy's trial testimony, she called several witnesses including her and David's child, Crystal's sixteen year old (who refuses to live at David's home), the guardian ad litem (GAL) from the modification action filed by Crystal's ex-husband during the same time frame of this case, and Mindy's husband. David testified along with his fiancée, Crystal, to support his case. In the presence of the parents, the child confirmed she preferred to live with Mindy and detailed examples of David's controlling behavior, including an incident that led to a bruise on her leg, depicted in a photograph discussed above. The allegation was investigated by DHS, but the child still described corporal punishment by David where he required

the children to do "wall-sits," or other physical actions without movement for minutes at time.[2]  In an incident where she ran away, the child described being forced to eat foods she did not like even after vomiting.  After retrieving the child, David and Crystal had the child write out a list of problems she was having and most of the problems related to Mindy.  The list became an exhibit at trial.  David said it was for the benefit of the counselor, but the counselor did not testify and there is no evidence it was ever sent to a counselor.  The child testified she was "forced" by David and Crystal to write the list, and the list never was addressed at counseling.  The child expressed frustration at an inability to be heard at her father's home, describing instances where David yelled at her for long sessions, while refusing to allow the child to discuss the offending incidents.  Finally, the child, along with David and Crystal, confirmed the removal of the child's door to her bedroom, which was described either as a punishment or protection for the child—depending upon who was testifying.

Although not in the Wolff home for many months, Crystal's oldest child described the same punishments and controlling behavior of David.  Crystal's child speculated that David had "more control" over his own child so the punishments imposed on her were more "over the top" and not appropriate for the incident.

During the trial, the district court observed that the parties' child "was pretty adamant about wanting to have a change and go to Mom's and just have visitation

---

[2] One punishment was "assume the position" where a child would have to crouch for minutes at a time without the aid of a wall.  The wall sits were most common, but if these actions were not correctly done, the child would be hit in the leg, sometimes with a bamboo-like stick, as a reminder of the correct stance.  David said the punishment "usually never goes over five minutes.  So maybe like three, four minutes."  Crystal's child testified the wall sits lasted five to ten minutes.

with Dad and stuff." While we consider the preference of the child, we do not weigh it as heavily in modification proceedings. *See In re Marriage of Behn,* 416 N.W.2d 100,102 (Iowa Ct. App.1987). But when making the physical-care determination, we consider these factors: "(1) the child's age and educational level, (2) the strength of the child's preference, (3) the child's relationship with family members, and (4) the reasons the child gives for [her] decision." *See McKee v. Dicus*, 785 N.W.2d 733, 738 (Iowa Ct. App. 2010); *see also* Iowa Code §§ 598.41(3)(f), 600B.40 (2019). After considering these factors, we afford weight to the child's preference. Adding to our comfort, we recognize that the testimony from the older child of Crystal reaffirmed the conditions and concerns that David's child discussed with maturity in her testimony.

In our view, Mindy established that while she and David could co-parent in the past, David's attitude and style of discipline hampered a healthy shared parenting arrangement for their now teenaged child. And unlike the district court, we cannot afford David the benefit of the doubt that he will or can make the changes addressed in the ruling. *See Harris,* 877 N.W.2d at 441 (determining that the court's implicit confidence in the parents' ability to communicate under a joint physical care arrangement was misplaced); *see also In re Marriage of Walton,* 577 N.W.2d 869, 871 (Iowa Ct. App. 1998) ("The court cannot order an awakening by the parties . . . . This is something [the parents] must do on their own."). Highlighting that conclusion, we point to the November 2019 written analysis of the GAL in the case involving Crystal and her ex-husband, and contrast it with David's December trial testimony. The GAL specifically noted that after conversations with Crystal's children, David was identified as the "nucleus of concern." Specifically,

the GAL referenced the stress caused by David's style of parenting and his disciplinary practices.[3] The GAL advised, "I think disciplinary practices need to [be] reevaluated immediately and conform to age appropriate practices at both homes." Yet, after that report, the next month in trial, David found nothing wrong with his disciplinary style when describing himself as the disciplinarian of the home. He offered no insight into how the techniques and the yelling impacted the children. David offered that "[r]ules are rules and they exist for a reason. And kids don't need to understand why they exist for a lot of the time. Because I said so is just fine because it is for the benefit of the kids." He blamed his yelling on the fact he has a hearing issue requiring hearing aids.

Similarly, David downplayed his lack of open communication with Mindy about taking the child to two mental-health counselors. He claimed he tried to call Mindy to tell her and told the counselors to notify Mindy—which never happened. Although most communication occurs with text messaging, David had no excuse for his failure to use that mode to inform Mindy of appointments or even that the child was seeing a therapist. After listening to the excuses David gave for failing to alert Mindy about counseling sessions for the child, the court lectured

> Well, let me interrupt here because I don't think you're quite getting this. When you have co-parenting, it is your absolute obligation to inform each other about any therapy or medical or anything else. And just sitting back and saying, well, I didn't keep it from her, but I didn't tell her about it, you know what that makes me think? It makes me think you're not doing a very good job co-parenting.
>     . . . .
>     If I leave this thing alone and if you ever come back into this courtroom, in my courtroom again and say, well, I didn't tell her, you

---

[3] The GAL referenced use of wall sits, London bridges, and picking up and holding stones as causing substantial issues, along with excessive yelling.

know, but I didn't keep it from her, you'll lose custody of that child.
Do you understand?

We find David's excuses insincere, especially given the dichotomy between his demands that he be told of and approve every medical appointment, hiding from Mindy the many months of counseling sessions for the child he scheduled.

Here, the acrimony between these parents creates a situation in which joint physical care cannot be successful. *See In re Marriage of Gensley*, 777 N.W.2d 705, 714 (Iowa Ct. App. 2009) (finding an overriding factor weighing against joint legal custody and physical care is the parents' utter inability to communicate with each other because of toxic relationship). The parties do not talk and have a lack of trust in each other—all impediments to a successful joint physical care plan. Coupled with the communication problems, we find the cooperation issues to also be problematic. *See In re Marriage of Swenka,* 576 N.W.2d 615, 617 (Iowa Ct. App.1998) (allocating physical care to one parent because the parents could "not cooperate and d[id] not respect the parenting or lifestyles of the other"). David's style of home management of—you do it because I said so—transfers poorly into a co-parenting arrangement and appears from this record to be impacting not only his child, but unfortunately other children in the home as well. This joint physical care arrangement has not evolved as contemplated when the agreement was signed. The parties agreement contains many references to joint decision making and open communication. With David's demanding style this arrangement has evolved into one where what he decides and does is what is best for the child. In practice, the opposite is true. The stress on the child with the punishments, the attitude about possessions, the inability to communicate about basic decisions,

and the tense atmosphere at David's home could not have been contemplated when the agreement terms were set. With our focus on this child, we find the discord between David and Mindy has rippled into a disruptive effect on this child's life so that a substantial change of circumstances has occurred. *See Melchiori*, 644 N.W.2d at 368 (noting that discord between parents warrants a change of custody if it causes a disruptive effect on the child's life).

We also examine whether Mindy proved she possessed a superior ability to minister to the needs of the child. *See Frederici,* 338 N.W.2d at 158. The child described Mindy's home and style of parenting as one that encouraged her viewpoints, was more like the "normal" family home her friends experience, and, yet, still involved appropriate discipline. Mindy described a "very open" style of communication. In reviewing the best-interest-of-the-child standard, we find changing the custody arrangement so that Mindy is the physical care provider is warranted. "Utilizing the best-interest standard 'provides the flexibility necessary to consider unique custody issues on a case-by-case basis.'" *Hansen*, 733 N.W.2d at 696. We agree with the district court that David's "this way or the highway" mentality must stop, and this result ensures that it will while recognizing the best interests of the child. "The objective of a physical care determination is to place the child[ ] in the environment most likely to bring [the child] to health, both physically and mentally, and to social maturity." *Id.* at 695.

After our review, we reverse the district court ruling and modify the decree to award Mindy physical care of the child. We order visitation for David to be every other weekend (preferably during the weekend Crystal's children are in the home) and provide David four weeks of summer visitation in two-week intervals, with

notice of those weeks to be provided no later than May 1st of each year. Holiday visitation shall remain as previously ordered. We remand for a determination of the child-support obligation David should pay and for a determination of the responsibility for health insurance based on the affidavits and record provided at the trial and with any further hearing the district court, in its discretion, may require. The other provisions of the stipulation under paragraphs V. and VI. remain intact. Finally, we encourage more flexible visitation as the parties can agree and support open communication between each parent and child.

*Appellate Attorney Fee Request.*

Mindy also requests appellate attorney fees. "In a proceeding to determine custody or visitation, or to modify a paternity, custody, or visitation order . . . the court may award the prevailing party reasonable attorney fees. Iowa Code §600B.26. When considering whether we should exercise our discretion to award appellate attorney fees, we examine "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). We decline to award Mindy appellate attorney fees as she has the ability to pay her own fees.

*Conclusion.*

After our de novo review of the record, we reverse the decision of the district court and modify the decree to award Mindy physical care of the child. We remand to the district court for consideration of the appropriate child-support award after considering the responsibility for health insurance and any other orders consistent with our decision. We decline to award appellate attorney fees.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**