# IN THE COURT OF APPEALS OF IOWA

No. 20-1145
Filed June 30, 2021

IN RE THE MARRIAGE OF MELISSA BICKERTON
AND BRIAN BICKERTON

Upon the Petition of
MELISSA BICKERTON,
        Petitioner-Appellant,

And Concerning
BRIAN BICKERTON,
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Clayton County, Alan Heavens,

Judge.


        Melissa Bickerton appeals the district court order awarding physical care of

the children to Brian Bickerton.  She also disputes the calculation of her child

support obligation if custody is not changed.  **AFFIRMED AS MODIFIED AND**

**REMANDED FOR FURTHER PROCEEDINGS.**


        James Burns of Miller Law Office, P.L.C., Decorah, for appellant.

        Brian Bickerton, Monona, self-represented appellee.


        Considered by May, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

At the dissolution-of-marriage trial, the four children voiced a preference to live with their father, Brian Bickerton. Their mother, Melissa Bickerton, contends the district court weighed the children's stated preference too heavily. Melissa urges that deciding custody is far more complicated than asking children where they want to live. Arguing the district court failed to understand the children's motivation for their views and should have given her history of caretaking more weight, Melissa claims the district court got it wrong. She also disputes the calculation of her child-support obligation if physical care is not changed. Under our de novo review, we examine the record with the best interests of the children at the forefront.

**I. Factual and Procedural Background.**

These parents, who married in 2004, have four children[1] who were between the ages of ten to fifteen years at trial. Melissa was forty-two years old at trial and working as a dietary aid at a care center ten hours per week.[2] As a couple, she and Brian lived together in several states, including Texas, Georgia, and Illinois. Melissa returned to Iowa with only the children in 2016. After being injured during service in the Army,[3] Brian ultimately retired from the military with a medical

---

[1] In order of birth, the children are L.B., R.B., S.B., and E.B. Melissa has seven other children, whose custody status is not involved in this dispute because they have other fathers. Although Brian initially refused to be tested, paternity testing established that two of the youngest children born during this marriage were not Brian's children.

[2] The care center paid Melissa $10.25 per hour.

[3] Brian's military service began in 2000 when he joined the Marine Corps and included two tours in Iraq. He was discharged honorably but then enlisted in the Army. His combined service in both the Marine Corp and Army lasted for almost ten years.

honorable discharge as he had back troubles, post-traumatic stress disorder (PTSD), and traumatic brain injury. Because of his injuries, Brian receives social security disability payments. Brian testified that he had severe depression and issues with his PTSD until he was charged with a felony assault against one of Melissa's children and the judge recommended a PTSD program. He finished treatment, which he contends resolved his PTSD issues. Believing there was a "five-year hold from [Melissa and the children]" because of the assault charges, Brian moved to North Dakota and remained there until March 2018 when he came to Iowa.[4] Prior to his move to Iowa, Brian went two years without seeing the children, although he had telephone contact. Brian was forty years old at the time of the trial. He reinstituted personal contact with the children when he moved to Iowa.

Separated for nearly two years, Melissa petitioned for a dissolution of her marriage to Brian in January 2018. At the time, Brian resided in North Dakota. In May 2018, at the temporary hearing stage, the district court granted Melissa temporary physical care subject to reasonable visitation by Brian. The arrangement worked with Brian having visitation on alternating weekends and holidays until June 15, 2020. Brian was to pick up the children at school and Melissa would retrieve them at an agreed upon law enforcement agency. No summer visitation was ordered. Yet, in the summer of 2020, Brian stated:

> Things were going okay for the first couple years up until this summer. That's when we started having issues. We've been doing the summer visitations every—every other week because originally

---

[4] There was another felony assault charge in North Dakota filed against Brian because of an alleged assault against a girlfriend, but Brian testified a jury acquitted him.

> it was put in by the judge, that four weeks. I was supposed to have four weeks with the kids.
>
> This summer, Melissa said it wasn't in the paperwork, that they didn't have to follow it.

Operating under the temporary order became difficult when four of the children refused to return home to Melissa. This "rebellion" occurred two months before the trial of the parents' dissolution of marriage. Ultimately, Melissa went to Brian's home to retrieve the children but they refused to leave his home. Melissa filed for contempt of court against Brian to seek the return of the children. Finding no credible evidence supported the allegation Brian deliberately prevented the children from returning to their mother, the district court dismissed the contempt application. As a final comment in the order, the district court noted there are "limitations of the court system in solving a family's problems."

From June 15 on, the children remained in Brian's home, but just before the August trial, the two older children did visit the mother and their half-siblings. The two younger children, ages ten and twelve, had not seen their mother or half-siblings for more than two months. Brian took the position of "I'm not going to say yes or no. I'm going to leave it up to the kids to make that decision if they want to go." Trial occurred over two days in August on the unresolved issues of custody, visitation, and child support. The district court awarded Brian physical care and provided a visitation schedule for Melissa. The decree required her to pay child support of $242 per month and cash medical support of $11.44 per month. Melissa

appeals the decree as to the physical care decision or, in the alternative, asks for a change in the child support calculation.

**II. Standard of Review.**

"Marriage dissolution proceedings are equitable proceedings." *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016); *see also* Iowa Code § 598.3 (2018). "Thus, the standard of review is de novo." *Mauer*, 874 N.W.2d at 106; *see also* Iowa R. App. P. 6.907. "Although we give weight to the factual findings of the district court, we are not bound by them." *Mauer*, 874 N.W.2d at 106; *see also* Iowa R. App. P. 6.904(3)(g). "But we will disturb a district court determination only when there has been a failure to do equity." *Mauer*, 874 N.W.2d at 106.

**III. Analysis.**

**A. Custody.**

In a pre-trial stipulation, Brian and Melissa agreed to joint custody but could not agree as to physical care. "Physical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child[ren]*." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* Unlike *Hansen*, we have a limited record to evaluate the differences in how these parents approach the routine care of the children. In the four paragraphs of the decree analyzing the specifics of the custodial question, two paragraphs addressed the children's preferences. The other paragraphs addressed trial testimony, and the district court concluded:

> In considering the sum of all credible evidence received at the trial on these issues, the Court determines that, while Brian is not a perfect person or parent, he does currently provide a stable and wholesome environment for his children and has not abused them in the ways that Melissa and other witnesses allege he has.

But in our de novo review, we start with the factors listed in Iowa Code section 598.41(3) and the non-exclusive factors enumerated in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) and apply those to the facts presented at trial. *McKee v. Dicus*, 785 N.W.2d 733, 737 (Iowa Ct. App. 2010). As in *McKee*, here the district court did not detail the precise reasons it would be in the children's "best interests" to be with Brian or exactly why it would "negatively impact" the children to be with Melissa. *Id.* at 738. In *McKee*, a panel of our court explained the lack of reasoning as "to a degree understandable" because:

> [o]ften trial judges who see the witnesses in a custody dispute come away with a gut feeling that one parent is a better fit than the other, though it may be difficult to explain the underlying reasons. Certainly it is preferable if the decree sets forth those reasons, even if that may not be literally required by the statute.

*Id.* Yet after a review of the factors that arm us with a path to determine what is best for the children, we cannot arrive at the same decision as the district court. Melissa's witnesses included herself, her father, a previous family counselor for two of the children, and two of her children who are not related to Brian. Without objection, a letter authored by Melissa's mother was made part of the evidence, which detailed personal observations of Brian's physical aggression against the children.[5] Melissa also presented exhibits referencing domestic battery by Brian against her and a child. The behavior health intervention specialist, Maryanne

---

[5] Examples of Brian's aggression were shoving the child against a wall and grabbing a child's ear and twisting until the child cried.

Harris, testified she has a master's degree in psychology. In March 2019, Harris became involved with the two older children, L.B. and R.B., under a psychiatrist's recommendation to address L.B.'s behavior issues and R.B.'s identity issues.[6] She opined that Melissa is a good mother and is improving her parenting over time. Brian complained about Harris's counseling behavior with L.B. so she removed herself from future counseling, but before that incident she attempted to set up a time to visit the children at Brian's home. He refused to accept the voluntary service. Harris has maintained contact with Melissa and her children as a friend. She opined it was not in the best interests of the children to keep them from contact with their mother and that it was inappropriate to have these children control their own visitation based upon their developmental stages.

Melissa's twenty-one-year-old child, N.G., testified about his mother's good parenting skills and Brian's anger and propensity to use physical punishment.[7] Describing the relationship Brian's children have with him, N.G. summarized: "I believe that their relationship is built on fear, the same way that he did to me and my—my other siblings that aren't biologically his. The only thing that we—we have learned from Brian is that you have to fear him or else he will retaliate against you." K.F., Melissa's seventeen-year-old child, described her close relationship with R.B. She relayed that R.B. told her the weekend before the trial Brian was doing "meth" and giving R.B. marijuana. R.B. also described being hit by Brian's live-in

---

[6] Harris treated L.B. from September 2019 until March 2020 and R.B. from August 2019 until February 2020. She also related that Melissa had to bribe L.B. to visit his father.

[7] N.G. described being hit with a paddle and the practice of "exercise punishment" involving holding a heavy object out in front of your body while in a sitting position up against a wall.

girlfriend, Sumitra Bryant, when R.B. objected to Sumitra saying bad things about Melissa. K.F. characterized Melissa as a good mother.

Melissa called Julissa Elsbernd, the family babysitter, as a witness. Julissa was in the home three to four times per week, starting in late October 2019. She reported to the Department of Child Services (CPS) that R.B. told her several times about Brian providing R.B. marijuana and Brian's use of methamphetamine. Julissa also indicated there were vague allegations about sexual abuse[8] and because she had not seen the younger two children recently, she called CPS to do a wellness check. Finally, Melissa's father, Robert Zwirlein, testified. He described an incident where R.B. ran from Brian's home to his:

> A couple weeks ago, maybe it's been a month now, [R.B.] came down one night really, really upset; and she was afraid that she might get hit or was afraid of Brian because what happened was—I don't know what was going on, but it must have been at the dinner table, [R.B.] said, and he got mad and slammed the silverware down on the table.
> They must have been talking about [Melissa's older daughter], [R.B.'s] sister, and Brian had called her a big-ass bitch; and that very, very much upset [R.B.]because [R.B.] came down, she was just totally beside herself, and says Brian is talking about my sister being a terrible person. [R.B.] says, "I love my sister."
> . . . .
> Because [R.B.] was afraid, if she didn't go back to her dad, she might be in really bad trouble and something drastic could happen to the other kids that were there. She was concerned about the other littler ones. So we got her calmed down and ended up she did go back to Brian's house.

Robert also expressed concern that even though he had regular weekly contact with the younger two children, he had not seen them for two and one-half months

---

[8] Julissa admitted the sexual abuse information has changed multiple times so she was not sure about it, but that one version related to Brian sexually abusing R.B.

since they moved in with their father. He also described being pushed by Brian during Brian's earlier altercation with N.G. in Texas.

In addition to testifying on his own behalf, Brian's evidence included a friend, Michael Riden, who had been homeless after trying to manage a "fleabag motel." Brian met Riden playing online video games. Riden stayed at Brian's home in Iowa for around forty-five days, and was still residing and working in Iowa at trial. Riden described Brian as a calming influence on the children. Brian taught him to be a better parent to his own son. Next, Riden's mother, who previously lived with Riden at the motel but resided with Brian and his live-in girlfriend Sumitra over the past year, testified about Brian's good parenting skills. Brian also called Sumitra as a witness. Sumitra previously lost custody of her own two daughters, although they have since reunited, but offered her observations of Brian's parenting skills with the children. She described Brian as an "incredibly loving father."

Brian also asked the district court to allow the four children to testify.[9] We deal with their testimony next. Given the emphasis of the children's preference in the district court's four-paragraph analysis of the facts supporting the custody determination, we agree with Melissa that the children's statements were an important factor in the district court's physical-care decision. From the children's testimony, the district court opined that "it was clear that the four children in this case have a close and healthy relationship with each other. All four children have a closer relationship with Brian than they do Melissa." Yet, "[w]hen we speak of

---

[9] Now arguing the children's testimony was influenced by Brian, Melissa complains that the children testified from the father's home, but the testimony was offered without objection.

what is best for the child, we do not mean that which the child wants." *In re Marriage of Ellerbroek*, 377 N.W.2d 257, 258 (Iowa Ct. App. 1985) (citation omitted). The preferences of a child, while not controlling, are relevant. *Id.* But when determining the weight to be given to a child's wishes, we consider the following factors: (1) the child's age and educational level; (2) the strength of the child's preference; (3) the child's relationship with family members; and (4) the reasons the child gives for his or her decision. *In re Marriage of Behn*, 416 N.W.2d 100, 102 (Iowa Ct. App. 1987). These children were ages fifteen, fourteen, twelve and ten years at the time of trial. Little information was developed about their maturity levels, but there were educational concerns with the older two children.

We are not convinced that the district court's questioning ferreted out the reasons for the children's preferences. And other than asking why they did not return to their mother's home after the June visit with Brian, the questions focused on who the child wanted to live with as opposed to gathering information about the role each parent played in the day-to-day living. The ultimate question is always which parent can minister more effectively to the long-range best interests of the children, and we learned little about how each child viewed their parents and who they relied on for all aspects of their care. There was some evidence that Brian offered less rules than Melissa, and certainly the children might receive less attention at Melissa's house with all of the other half-siblings in the home. *See Ellerbroek*, 377 N.W.2d at 258 (noting that children might manipulate the parents if allowed control over the choice, respond to a parent's needs and not his or her own, or may have other reasons for a choice unknown to the court).

In the end, when we examine the legislature's nonexclusive list of factors, several factors tip the scale towards Melissa. *See* Iowa Code § 598.41(3). Melissa's previous history of primary caregiving tops the list. Brian missed several years of involvement with these children. The court commended him for his care over the two-month testing ground where he provided full-time care. But under the factor involving each parent's support of the other, Brian has been unable to promote or require these children to have contact with their mother. We find that significant as the reasons the children gave for not returning to the mother's home offered no insight into their reluctance to return. One of the younger children explained the events when all decided to not return to Melissa's home:

> Q. And could you tell me what happened that day? A. My mother sent [half-sister] first; and my dad—my dad said, if we didn't want to go, we don't have to go because he said that . . . that Officer Jo said to stop making us kids go if we didn't want to. So we didn't go, and my dad sat out on the porch so that—so that it would be like—so it wouldn't be like people thinking he would be making us not go because he wasn't.

Melissa's past caregiving, her involvement in the children's mental-health counseling and schooling, and the half-sibling relationships weigh in her favor. *See Hansen*, 733 N.W.2d at 696–97. We have little history or information to assess Brian's stability, his current parenting style, and his ability to accept full parental responsibilities. The record is quiet on whether Brian engaged in school conferences or ever was involved with medical or mental-health care. In the few short months he had taken over care, we can only see that the children have missed important appointments, distanced themselves from the mother and the

grandparents, and now believe they can decide where they live.[10]  Although the district court did not mention the half-siblings or address those relationships in the questioning of the children, we consider that returning the children to Melissa will keep the siblings together.  *See Ellerbroek*, 377 N.W.2d at 260 (noting "the court ordinarily attempts to keep children of broken homes together").

After a consideration of the factors important to our review, we reverse the custody order and award physical care to Melissa.  Brian shall exercise the visitation rights established under the May 1, 2018 temporary custody order with these changes: (1) Brian shall provide all transportation for visitations and (2) Brian is awarded four weeks of summer visitation, exercised in weekly increments.  He shall provide notice of the weeks he intends to exercise on or before April 1 of each year.

**B. Child Support.**

Looking at the pre-trial stipulation, the parties agreed Melissa's net income equaled $1218.50 per month and Brian's net monthly income was $2967.30.  The district court used those numbers to calculate support.  "In Iowa, child support is calculated using the child support guidelines."  *In re Marriage of Erpelding*, 917 N.W.2d 235, 245 (Iowa 2018); *see* Iowa Code § 598.21B; Iowa Ct. R. 9.2.  "The purpose of the guidelines is to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children in proportion to their respective incomes."  Iowa Ct. R. 9.3(1).  Given our change

---

[10] There was limited information that R.B. returned to Melissa's home for a short time during the two-month pre-trial window of care at Brian's home but then returned to Brian's home.

in custody status, we remand for a determination of the appropriate amount of child support from Brian based on the current income figures available at the time of the hearing. The parties may address current income by affidavit or testimony at a hearing on the support issue.

**IV. Conclusion.**

We reverse the physical-care determination and award Melissa physical care with reasonable and liberal visitation in Brian. We remand for a determination of child support given this change in custodial status.

**AFFIRMED AS MODIFIED AND REMANDED FOR FURTHER PROCEEDINGS.**