# IN THE COURT OF APPEALS OF IOWA

No. 21-0280
Filed November 23, 2021

**DAVID SCOTT SHEPPARD,**
   Plaintiff-Appellee,

**vs.**

**CHELSEA RENEE REED,**
   Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, Judge.

A mother appeals an order giving the father physical care of their daughter and requiring her to pay child support. **AFFIRMED.**

Jeffrey M. Beatty, Cedar Rapids, for appellant.

Austin Norden of Viner Law Firm, Cedar Rapids, for appellee.

Considered by Tabor, P.J., and Greer and Badding, JJ.

**BADDING, Judge.**

David Sheppard and Chelsea Reed are the never-married parents of three-year-old A.S. At the trial in their custody dispute, Chelsea informed the district court that she viewed David as her enemy and someone who she didn't "want to communicate with at all." It was this attitude that became the deciding factor in the court's decision to place the child in David's physical care. Chelsea appeals this ruling, contending the court should have placed the child in her physical care and calculated child support using her actual earnings rather than earning capacity. We affirm.

## I.    *Background Facts and Proceedings*

David and Chelsea were living together in Cedar Rapids when A.S. was born. Chelsea had a young daughter and son from a prior relationship who also lived with them. For the first one-and-one-half years of A.S.'s life, Chelsea was a stay-at-home mom while pursuing her bachelor's degree online. David was the breadwinner of the family and often worked more than forty hours per week. He was also a musician in two bands, so he spent his free time practicing for shows.

This caretaking arrangement caused significant problems in the parties' relationship. According to Chelsea, many of their arguments centered on David not being around to help with the children. On top of that, David was struggling with alcohol abuse that led to incidents of domestic strife. Once in 2016, David came home intoxicated and strangled Chelsea during an argument. A neighbor called 911 after hearing glass shattering inside their home. David was arrested for domestic abuse assault causing bodily injury and later convicted of a lesser-included offense. After that occurrence, Chelsea left the home with her two

children and moved to Illinois to stay with her parents. A month later, she found out she was pregnant with A.S., which prompted her to return to Cedar Rapids and get back together with David.

The domestic disputes between the parties were not always one-sided. Twice during particularly heated arguments, Chelsea struck David in the head, requiring him to receive medical attention. Both gave varying accounts about how the arguments escalated into physical violence, each pointing the finger at the other as the aggressor. After two more years of discord, the parents ended their relationship once and for all. Soon after their separation, David petitioned to establish legal custody, physical care, visitation, and child support.[1] By the end of summer 2019, he moved into his own two-bedroom apartment.

Pending trial, the district court decided temporary joint physical care was in A.S.'s best interests. With that in mind, the court ordered the parties to share parenting time every two to three days on an alternating basis. Transportation was to be divided between them on an equal basis. Just a few days later, Chelsea decided to relocate to Illinois—over 165 miles away from where David was living in Cedar Rapids. She texted David that she did not intend to follow the court's order, telling him: "No fuck you [D]avid" and "fuck the judge and his order." David notified the court of Chelsea's move and requested that she become solely

---

[1] On the same day that she answered David's petition, Chelsea obtained a temporary protective order that granted her exclusive possession of the parties' home and placed A.S. in her temporary care. Before the hearing on whether a final protective order should issue, Chelsea dismissed her domestic-abuse petition. She then left A.S. and her other daughter in David's care while she went on vacation in South Carolina.

responsible for transportation. The court granted David's request and modified the parenting schedule to alternating weeks rather than days.

The parties shared care of A.S. under this schedule for more than a year. During that time, Chelsea made little to no effort to communicate with David. She would block him from her phone until she was fifteen minutes away from picking A.S. up on Sundays. Chelsea testified she wanted to communicate with David as little as possible because, in her view, "[w]e will never be able to productively co-parent. We will never get along." David did not feel the same. He said that he would never block Chelsea from his phone and that he tried to communicate with her. Unsurprisingly, in January 2021, the parties submitted a joint pretrial statement in which each sought sole physical care.

By trial, both parties had made substantial life changes. Chelsea was engaged to be married and living in a four-bedroom house with her fiancé and the children. She had obtained her bachelor's degree and was enrolled in an online program to become an Illinois-licensed real estate broker. She had a job lined up with a local agency and expected to make at least $35,000 in her first year. David had also entered a new long-term relationship and had been sober for about seven months. He attributed his success and motivation to quit drinking to his active involvement with his church. He was working full-time as a project coordinator for a company, which provided him flexibility to adjust his hours and work from home as needed.

After considering all the relevant factors, the district court awarded David physical care. While recognizing the serious allegations of domestic abuse, the court determined there was insufficient evidence to establish a history of abuse

against one parent. Alternatively, the court found both parties had engaged in assaultive conduct that "effectively cancel[led] each other out." When it came to which parent would render superior care, the court credited David's testimony that he would maintain sobriety and support A.S.'s relationship with her mother and half-siblings. In contrast, the court believed Chelsea would "undermine and destroy the relationship between [David] and [their daughter]." Relying on Chelsea's estimated income as a first-year realtor, the court ordered her to pay $559 in monthly child support. Chelsea appeals.

## II.     Scope and Standard of Review

We review orders establishing child custody and support de novo. *Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020). We give weight to the district court's fact findings, especially on credibility, given its exclusive ability "to listen to and observe the parties and witnesses." *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010); *see also In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (noting appellate courts "are denied the impression created by the demeanor of each and every witness as the testimony is presented").

## III.    Analysis

### A.     Physical Care

Chelsea argues that in deciding which parent should have physical care, the district court failed to give appropriate weight to her "historic role as primary physical caregiver" and A.S.'s strong bond with her half-siblings. Above all else, she contends the court "gave no weight to [her] behavior or her actions as co-parent, as a mother, or as a survivor of domestic violence." Emphasizing the latter, she devotes a large chunk of her brief to what she alleges was "the

unrebutted history of domestic violence," which she argues "outweighs all other factors."[2]

As David points out, Chelsea refused to provide any details of that history at the custody trial.  During her testimony, Chelsea asserted: "Every time [David] thought I was with some other guy or that I did something or went somewhere he would become a different person, completely paranoid, angry, aggressive."  But when counsel asked whether she wanted to discuss any other incidents of abuse, she replied: "They're in my no contact orders, my exhibits, the things that I've already submitted to the case file, so I don't want to talk about them."  The primary source of Chelsea's allegations was her personal affidavit submitted in September 2019 before the temporary custody order was entered.  David denied those allegations in his responsive affidavit.

After reviewing those filings, we cannot agree with Chelsea that the evidence shows an "unrebutted history of domestic violence" with David as the perpetrator.  *See* Iowa Code § 598.41(2)(c) (2019) (providing that in custody determinations only "a history of domestic abuse . . . , *which is not rebutted*, shall outweigh consideration of any other factor" (emphasis added)).  The district court correctly focused on the domestic violence incidents discussed during trial, which were detailed in its final ruling:

> There clearly was at least one incident where David assaulted [Chelsea].  In this incident he choked her.  He was prosecuted and ultimately entered a guilty plea to a lesser offense.  David also has

---

[2] In support of her argument that she was a victim of domestic abuse, Chelsea relies on various websites detailing behavioral patterns of abusers.  None of the information from these websites was presented to the district court or properly in the record before us.  *See, e.g.*, *Kehoe v. State*, No. 18-0222, 2019 WL 6893771, at *8 (Iowa Ct. App. Dec. 18, 2019).

convictions for public intoxication and another assault. [Chelsea's] evidence included evidence that he assaulted his former wife as well. The last documented incident of an assault by David is from 2016. The last documented incident of public intoxication is from 2011.

The court continued:

The evidence ultimately established that in one fight [Chelsea] hit David in the head with a wine bottle and fractured his skull, resulting in David being placed in intensive care. [Chelsea] claimed this fight began with David striking her. In another incident [Chelsea] stabbed David in the forehead with her keys during an argument. In this incident [Chelsea] admits David did not physically assault her.

Based on the evidence acknowledged by both parties at the custody trial, the court determined they were each responsible for instances of physical violence. Plus the court found no credible indication that "either of the parties ever used physical abuse to control the other" or that they engaged in "regular emotional or verbal abuse." As for David's convictions, the court believed his past assaults were linked to his alcohol abuse and thus stressed the recent sobriety he gained with help from his girlfriend and church. *See In re Marriage of Ford*, 563 N.W.2d 629, 632 (Iowa 1997) (giving weight to district court's finding that domestic abuse was no longer a problem because of husband's sobriety and support system). The record supports those findings.

While domestic abuse is a significant factor in determining physical care, it does not automatically outweigh all other factors. *See In re Marriage of Daniels*, 568 N.W.2d 51, 54–55 (Iowa Ct. App. 1997). We give this factor less weight when the parties' documented incidents of domestic violence are few and far between and there is no clear pattern of battering by one spouse to the other. *See In re Marriage of Forbes*, 570 N.W.2d 757, 760 (Iowa 1997). At best, the record reflects

that Chelsea and David both might have been the aggressor at times. Under these circumstances, the district court properly determined that no history of domestic violence existed between the parties, or at least that it was not a controlling factor in the custody determination. *See id.* (finding evidence of domestic abuse by both parties rebutted the statutory presumptions of custody under Iowa Code section 598.41).

Turning to the other factors, the court did acknowledge that Chelsea was the primary caregiver to A.S. before the parties separated. *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (reiterating that "stability and continuity of caregiving are important factors that must be considered in custody and care decisions"). But it found her history of caregiving was overshadowed by David's more active role in parenting since the fall of 2019. *See Flick v. Stoneburner*, No. 15-1930, 2016 WL 2743449, at *2 (Iowa Ct. App. May 11, 2016) ("Although our court recognizes greater primary care experience as a factor to be considered, it is not dispositive."). The court explained, "Once temporary orders were entered David began providing roughly half the care for [A.S.]" What's more, the court expressed concern that "[Chelsea] exhibited a disturbing tendency to chafe at being a full time mother," pointing to text messages she sent to David suggesting "she might harm herself or the children because she regretted having children, felt the children had ruined her life, and did not want to have to care for the children."

While Chelsea admitted her text messages were troubling, she chalked it up to her "venting and complaining to David." Yet her threats of harm to the children raised red flags for the court, particularly when combined with her

testimony that she used corporal punishment as a form of discipline and her lack of concern for A.S.'s safety in other respects.

For instance, David testified A.S. would return to his care "sometimes very dirty, sometimes bruised, sometimes in a very bad mood." As proof, he took photos of the child with various bruises on her forehead, arms, and legs that appeared after she had stayed at Chelsea's house. When asked about the photos, Chelsea minimized and denied her role in the child's injuries, claiming most of the bruises stemmed from "self-inflicted accidents," like when A.S. was "throwing a fit and banging her head on the floor." As for a bruise on the child's upper arm, Chelsea stated that she had never seen it before. But the court was skeptical of Chelsea's excuses, noting the bruise was "consistent with someone grabbing [A.S.] by the arm with considerable force." Based on the earlier texts, the court remarked: "It is certainly possible that Chelsea grabbed [A.S.] by the arm and left a significant bruise."

Beyond the physical injuries, David introduced several other exhibits revealing Chelsea's apparent lack of supervision. One photograph depicted A.S. with an unsecured gun in the background. Chelsea downplayed any safety concerns, asserting "an unloaded gun with no bullet in the chamber is just a heavy bat." There was also a video of A.S. out of her car seat and without a seatbelt while Chelsea was driving. Again, Chelsea made light of the situation, reasoning "the center of the back seat is actually the safest place in a vehicle for outside the car seat." Considering all these events, the district court was rightly concerned about the child's physical safety when in Chelsea's care.

That being said, the critical factor in the court's determination of physical care, and ours, was whether either parent could "support the other parent's relationship with the child." Iowa Code § 598.41(5)(b). We do not tolerate hostility exhibited by one parent to the other. *See In re Marriage of Lee*, No. 05-1248, 2006 WL 2059309, at *3 (Iowa Ct. App. July 26, 2006). The district court found Chelsea was hostile toward David and would do anything "to prevent [A.S.] from having and maintaining a positive relationship with [him]." In fact, Chelsea admitted as much at trial, testifying that it would be "unwise" for her to try to maximize David's time with A.S. in part because it would require her "to communicate with him more." In outlining her ideal custody arrangement, Chelsea asserted: "I would like [A.S. ninety-five] percent of the time, Monday through Sunday. I don't want to share her with someone that I have to communicate with daily who I don't want to communicate with at all, someone that I left and for a reason." Her unwillingness to co-parent, along with the aforementioned factors, tipped the balance in favor of awarding David physical care. We thus defer to the court's fact findings, including its specific credibility determinations. *In re Marriage of Gensley*, 777 N.W.2d 705, 717 (Iowa Ct. App. 2009).

As a final counterbalancing consideration, Chelsea emphasizes the long-standing principle that sibling relationships, including half-siblings, should be maintained absent a compelling reason. *See In re Marriage of Quirk-Edwards*, 509 N.W.2d 476, 480 (Iowa 1993). Despite that standard, the back-and-forth accusations between the parties and Chelsea's refusal to communicate with David cast doubt on whether maintaining A.S.'s relationship with her half-siblings will

promote her long-term interests. *See In re Marriage of Will*, 489 N.W.2d 394, 398 (Iowa 1992).

Having reviewed the record de novo, we agree with the district court that placing physical care with David is in the child's best interests as he is more likely to support her other relationships and bring her to healthy physical, mental, and social maturity. *See Hansen*, 733 N.W.2d at 695. Thus, we affirm the award of physical care to David.

### B.    Child Support

After resolving the custody dispute, the district court ordered Chelsea to pay David $559 per month in child support. The court calculated that amount using an earning capacity of $35,000 for Chelsea. This was based on what Chelsea estimated her salary would be once she obtained her real estate license and began working full-time.

On appeal, Chelsea claims it was error for the district court to use her earning capacity rather than actual income in calculating her monthly payments because the court did not make the written findings required by Iowa Court Rule 9.11(4). We disagree. While the court did not make an explicit written determination that if Chelsea's "actual earnings were used, substantial injustice would occur or adjustments would be necessary to provide for the needs of the child(ren) or to do justice between the parties," we can make such a finding on our de novo review. *See In re Marriage of Dugan*, No. 18-1834, 2019 WL 2871472, at *3 (Iowa Ct. App. July 3, 2019) (quoting Iowa Ct. R. 9.11(4)).

Chelsea asserts her "job as a realtor and future income was speculative and uncertain." She points to her 2019 tax return in which she reported $3221 in actual

earnings as "the most recent, reliable indicator of her income at the time of trial." But the record, including her own testimony, belies her assertions. On cross-examination, counsel asked: "Are you requesting that the Court impute your income at 35,000?" Chelsea replied: "That would be realistic." When asked to confirm whether her individual income would be at least that amount per year, she said, "Correct." Counsel also pointed out to her that she had imputed a higher income—$42,000 per year—when filing her child support guidelines worksheets earlier in the proceedings. Chelsea responded: "Interesting." Despite her many chances to cure any misunderstanding about her current and future financial situation, she did not do so. On this record, we decline to disturb the court's calculation of child support. Having found no reversible error, we affirm.

**AFFIRMED.**