**IN THE COURT OF APPEALS OF IOWA**

No. 23-0014
Filed November 21, 2023


**BRIAN BRADLEY YORK,**
        Petitioner-Appellant,

**vs.**

**KATELYN ELAINE HEIKENS,**
        Respondent-Appellee.
_____


        Appeal from the Iowa District Court for Grundy County, Andrea J. Dryer,

Judge.


        A father appeals a custody decree placing the parties' children in the

physical care of their mother. **AFFIRMED.**


        C. Aron Vaughn of Kaplan & Frese, LLP, Marshalltown, for appellant.

        Terry D. Parsons of Olsen & Parsons Law Firm, Cedar Falls, for appellee.


        Considered by Greer, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

"We are fire and gasoline," said Katelyn Heikens when describing her twelve-year relationship with Brian York. During that relationship, Katelyn and Brian had two children together—a daughter born in 2013, and a son born in 2018. After being arrested for domestic abuse assault causing bodily injury against Katelyn, Brian sought joint physical care of the children. The district court denied his request, instead placing the children in Katelyn's physical care.

Brian appeals, claiming that although he and Katelyn "had their ups and downs," the court should not have written "off the possibility of successful joint physical care." On our de novo review of the record,[1] we find the court carefully considered, and correctly rejected, that possibility. So we affirm its decision to place the children in Katelyn's physical care, and we grant Katelyn's request for appellate attorney fees.

*I.     Physical Care*

In candid testimony, Katelyn admitted that during her relationship with Brian, she was an "avid user of marijuana." That changed in April 2021 after a chaotic Easter weekend with Brian and the kids. On their way to a friend's house, the couple started arguing about messages from another woman that Katelyn found on Brian's phone. Brian began driving erratically, "slamming on the brakes, even on the gravel roads," with the children in the backseat. Once they got to the friend's house, the children ran inside, "crying hysterically." Brian stayed outside, "screaming about how he was wanting to kill himself." He eventually left, telling

---

[1] *See Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020) (reviewing matters involving child custody de novo); *see also* Iowa R. App. P. 6.907.

Katelyn that he had gotten called into work, although she later found out he went to the casino.

Brian came back Sunday morning, and the family started driving home. They stopped at a gas station on the way. While Brian and the children were inside, Katelyn opened the vehicle's center console and found a drug pipe with residue. She confronted Brian when they got home, telling him, "I know." They argued in the basement, and Brian again made threats to commit suicide, even wrapping electrical wires around his neck and putting the barrel of a shotgun in his mouth. Katelyn was sitting in a recliner and had turned away from Brian. So he got in front of her and pulled her legs apart, leaving bruises on the back of her knees. She just kept repeating, "You need to go."

When their daughter opened the door to the basement and asked them to stop fighting, Katelyn went upstairs. Brian followed her. He screamed at their daughter, "Your mom's killing me," while punching himself in the face. Katelyn got in between them and told Brian he had to leave. Before he did, Brian held a knife to his wrist and said, "I'm just going to kill myself." Then he took off on his motorcycle. Katelyn filed a police report the next day, and Brian was arrested at the children's daycare. His cell phone and a pouch were found under a daycare employee's vehicle. Inside the pouch, the employee found a "pipe of meth/crack" and a "baggie that had a rock of some sort."

A criminal no-contact order was entered prohibiting Brian from having contact with Katelyn or the children, and a juvenile court case was opened. The children were adjudicated in need of the court's assistance and placed in Katelyn's custody under the protective supervision of the Iowa Department of Health and

Human Services, with supervised visitation for Brian.[2]  Katelyn immediately stopped using marijuana and began substance-abuse treatment, which she completed in January 2022.  Brian completed a substance-abuse evaluation in September 2021 that did not recommend treatment based on his denial of any "concerns related to substance abuse."  But in October, his hair-follicle test for the department was positive for methamphetamine and amphetamines.[3]

In March 2022, Brian pled guilty to simple assault to "speed up the process" and "just get it done with."  He did not complete any courses for domestic abuse or anger management.  But once the criminal case ended, his visits with the children became unsupervised and, in May, the juvenile court case closed.  That same month, the district court entered a temporary order placing the children in the parties' joint legal custody and Katelyn's physical care pending the trial in August.

At trial, Brian continued to downplay his drug use.  When asked whether he used methamphetamine, Brian responded, "You know, I'm not gonna say that I haven't, but I don't use it currently."  Yet he refused Katelyn's request to take another hair-follicle test, testifying: "I don't feel that I should have to."  He also minimized the domestic abuse in his relationship with Katelyn: "it was more verbally.  Just we both are passionate people. . . ."

---

[2] The court modified the no-contact order at some point to remove the children as protected parties to allow this contact.
[3] Brian challenged the result in juvenile court with a letter from his doctor, who said his medication for attention deficit hyperactivity disorder caused the positive result. The director of the lab that performed the testing testified at the custody trial that was "an incorrect statement" because Brian's medication was a structurally different drug than methamphetamine and wouldn't be detected on a hair test.

Katelyn testified it was much more than that, describing three times before April 2021 when Brian was physically and emotionally abusive to her. One was in October 2019, when Brian pinned her down on a bed and punched holes in the wall of his parents' home. The second time was in August 2020. Brian again pinned Katelyn on a bed, grabbed her by the hair, and left bruises on her arms and legs. He was arrested and charged with assault causing bodily injury, but after they reconciled, Katelyn had the charge dismissed. Just a few months later, the police were called again, this time when the family was vacationing in Florida in December. Brian was acting so erratically that Katelyn and the children locked themselves in a bedroom before climbing out a window to get to their van.

Despite these struggles, Katelyn and Brian each agreed the other was a good parent. Even though he made derogatory comments about Katelyn in social media posts—calling her dumb, lazy, and scum, and wishing that she would "die and burn in hell"—Brian testified she was a "wonderful parent." And Katelyn testified that overall, Brian was "a great dad," who wanted to be involved with the children. After the temporary order was entered, Katelyn was flexible with Brian's visitation, often agreeing when he asked for extra time with the children. She testified, "They look forward to going and visiting their dad. They are happy when they come home."

Brian highlights these positives on appeal,[4] arguing the "record is replete with evidence that the parties can successfully communicate and co-parent and

---

[4] Buried within his claim that the district court erred in denying his request for joint physical care, Brian makes passing references to the district court's failure to give an expert witness's testimony appropriate weight and denial of his application to reopen the record after trial for additional evidence. Because Brian cited no

that they had in fact been doing so, despite the prior tribulations of their relationship." But we agree with the district court these "tribulations" cannot be overlooked. *See In re Marriage of Hansen*, 733 N.W.2d 683, 698 (Iowa 2007) ("Where the parties' marriage is stormy and has a history of charge and countercharge, the likelihood that joint physical care will provide a workable arrangement diminishes.").

In denying Brian's request for joint physical care, the court stated Katelyn's testimony about Brian's "reckless behavior was detailed, credible, and supported by exhibits and credible testimony from other witnesses." *See McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010) (giving "weight to the factual findings of the district court, especially when considering the credibility of witnesses"). With that history, the court found:

> [Brian] does not display the respect for [Katelyn] or the ability to communicate and express opinions in a mature fashion that are essential to implement a joint physical care arrangement that will operate with minimal conflict between the parents and create an environment likely to bring the children to healthy mental and social maturity. The relationship between [Brian] and [Katelyn] has been "off and on," characterized by separations, a great deal of conflict, and volatile behavior by [Brian]. Joint physical care is not in the best interests of the children.
>
> Due to [Brian's] repeated displays of temper, emotional instability, and immaturity, he is not the parent with whom the children should be primarily placed or the parent who should have the greater responsibility for the children's daily care and supervision.

---

authority in support of these issues, we consider them waived and do not address them further. Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *see State v. Tyler*, 867 N.W.2d 136, 166 n.14 (Iowa 2015) (indicating a "passing reference" in a brief is insufficient).

We agree, giving weight to these fact findings, especially the court's credibility determinations. *See id.*

Our most important consideration is, of course, the children's best interests. *See* Iowa R. App. 6.904(3)(o). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. For both married and unmarried parents, *see Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988), we are guided by the factors set out in Iowa Code section 598.41(3) (2021) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).

The key factors here are Brian's unaddressed domestic violence and substance abuse. *See In re Marriage of Daniels*, 568 N.W.2d 51, 55 (Iowa Ct. App. 1997) ("[S]pousal abuse discloses a serious character flaw in the batterer, and an equally serious flaw in parenting."); *Kaspar v. Biermann*, No. 21-0123, 2022 WL 1100244, at *4 (Iowa Ct. App. Apr. 13, 2022) (finding a mother's substance-abuse issues and poor decision-making supported placing the child in the father's physical care). These factors can outweigh other considerations in determining whether joint physical care is in the children's best interests,[5] including the

---

[5] Those other considerations are:
> (1) "approximation"—what has been the historical care giving arrangement for the child[ren] between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99).

historical caregiving arrangement for the children. *See Hansen*, 733 N.W.2d at 697 (stating a parent's substance abuse may outweigh "considerations of stability, continuity, and approximation," as can evidence of untreated battering, which "gives rise to a presumption against joint physical care"). But even that important factor was on Katelyn's side of the scale.

Though Brian argues that he "was heavily involved with both children from the time of their births," he does not dispute that Katelyn was their day-to-day caregiver, both during their relationship and after. *See id.* at 696 ("[S]tability and continuity of caregiving are important factors that must be considered in custody and care decisions."). The children were, according to the juvenile court's dispositional order, "thriving in their mother's care." *See id.* at 697 ("[T]he successful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality.").

So while the parties may have been communicating better in the lead-up to the trial,[6] "[w]hat's past is prologue." *In re K.F.*, No. 14-0892, 2014 WL 635463, at *4 (Iowa Ct. App. Sep. 17, 2014); *accord Kaspar*, 2022 WL 1100244, at *3 ("Insight for the determination of the child's long-range best interests can be

---

[6] We note they were doing so in violation of a criminal no-contact order in place until March 2028 that was entered as part of Brian's guilty plea to simple assault. While Katelyn testified that she supported modifying the order to allow communication about the children by text or email, its presence inhibits the level of communication needed to make joint physical care work. *See In re Marriage of Hynick*, 727 N.W.2d 575, 580 (Iowa 2007) ("The critical question in deciding whether joint physical care is . . . appropriate is whether the parties can communicate effectively on the myriad of issues that arise daily in the routine care of a child."); *see also In re Marriage of Terry*, No. 11-1903, 2012 WL 2819333, at *3 (Iowa Ct. App. July 11, 2012) ("The no-contact order is evidence of the significant degree of conflict and abuse in [the parents'] relationship.").

gleaned from evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing." (quoting *In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012)). The past shows the best environment for these children is with Katelyn, who is supportive of Brian's relationship with them—another factor in her favor. *See* Iowa Code § 598.41(1)(c); *In re Marriage of Gartner*, No. 15-1370, 2016 WL 3002778, at *6 (Iowa Ct. App. May 25, 2016) ("[A] parent's willingness to encourage contact with the noncustodial parent is a critical factor in determining custody.").

We understand Brian's argument that "the children should not be deprived of the maximum opportunity for contact with each parent." *See* Iowa Code § 598.41(1)(a). But that statutory directive "is in the context of what 'is reasonable and in the best interest of the child[ren].'" *Petersen v. Keller*, No. 11-1923, 2012 WL 3590731, at *3 (Iowa Ct. App. Aug. 22, 2012) (quoting Iowa Code § 598.41(1)(a)). Here, we agree with the district court that joint physical care—which is all that Brian asks for on appeal—is not in the children's best interests for the reasons detailed above. This does not, however, diminish Brian's important role in their lives. *See Hansen*, 733 N.W.2d at 705 ("[T]he quality, and not the quantity, of contacts with the non-custodial parent are the key to the wellbeing of the children."). We accordingly affirm the district court's decision placing the children in Katelyn's physical care.

## II.    *Appellate Attorney Fees*

We also grant Katelyn's request for $4000 in appellate attorney fees, which was supported by an attorney fee affidavit and itemization, given her success on appeal and Brian's higher income. *See McCullough v. Cornette*, No. 20-1211,

2021 WL 1399746, at *3 (Iowa Ct. App. Apr. 14, 2021) ("Iowa Code section 600B.26 permits our court to award reasonable attorney fees to the prevailing party."); *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005) (considering "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal").

**AFFIRMED.**